THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSEPH MAPP, Defendant-Appellant.

First District (1st Division)  No. 1—95—2600

Opinion filed September 23, 1996.

Rita A. Fry, Public Defender, of Chicago (Hugh Stevens, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James Beligratis, and Patricia Melin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WOLFSON delivered the opinion of the court:

During jury selection in this murder and armed robbery case, the prosecutors made a shambles of Supreme Court Rule 234 (134 Ill. 2d R. 234). They indoctrinated, preeducated, conditioned, and pretried.

After both sides rested, the State's final argument contained improper references to the victim's surviving family.

Joseph Mapp (Mapp) was convicted by the jury and sentenced to 55 years for murder and 25 years for armed robbery, the sentences to be served concurrently.

Despite our misgivings about the way the jury was selected and about the State's final argument, our review of the evidence persuades us that the convictions should be affirmed.

## FACTS

Joseph Mapp was arrested the day after Larry Shelton (Shelton) was killed. After Mapp was arrested, he made a statement. The statement was read to the jury. According to the statement, a few nights before August 12, Mapp, Joseph Martin (Martin), and Joseph Richardson (Richardson) were riding around in Mapp's mother's Isuzu Rodeo. Martin said Shelton owed him money. The three came up with a plan to get the money back. They decided to point a gun at Shelton and ask for it, thinking Shelton would not refuse. Mapp suggested they use masks to hide their identities.

When Mapp picked up Martin to drive around in the Rodeo on August 11, 1993, Martin had a Tech 9 gun with him. When they saw Shelton in his van, they decided to carry out their plan. Martin gave Mapp the Tech 9. Mapp saw that the gun was loaded. They put on their masks. Mapp borrowed Richardson's jacket to hide his hair. Mapp and Martin left the truck.

Mapp and Martin approached Shelton, who was walking with his family, from different sides. Martin shot Shelton. Shelton dropped everything he was carrying. Mapp approached Shelton with the Tech 9 and picked up two key chains Shelton had dropped. He shoved Shelton in the back. Martin shot Shelton again. Mapp stepped back to avoid being shot himself. Martin fired several more shots. Then Mapp and Martin ran off. As they did, they threw away their masks and jackets. Richardson saw them and picked them up in the Rodeo. Mapp and Martin suggested that the guns be wiped to destroy fingerprints. Richardson agreed to do this. Mapp went to his girl friend's house. That was the statement.

An assistant State's Attorney testified he read the entire statement to Mapp. Mapp signed the statement and initialled corrections. Mapp can read and has completed four years of high school.

Shelton's daughters, Robin and LaDonna, and his fiancée, Stephanie Turnbull (Turnbull), testified for the State as eyewitnesses. They described what happened early in the morning of August 12, 1993. At that time, they, Shelton, and two other children returned home from an evening outing. Turnbull was carrying her and Shelton's two-month-old son. They lived at 3500 S. Lake Park in Chicago, Illinois. They parked on the street in front of the building. Everyone but Turnbull walked to the building. Turnbull stayed at the van to lock it, then followed the others.

Two men approached Shelton. The men carried guns. They wore masks. Although LaDonna knew Martin and Mapp, she could not identify them because of the masks. One man had a silver gun, the other a black gun. Later testimony showed Martin had the silver gun and Mapp had the black gun.

The eyewitnesses' description of the incident was similar to Mapp's. In addition, Robin said the first shot hit her in the ankle. The children then ran to the building. They heard four to five more shots.

LaDonna had seen Martin, Mapp, and Richardson in the parking lot just before the incident. She saw Martin and Mapp head toward her building. She saw a blue Isuzu Rodeo truck the three often used.

Turnbull said that as the man with the silver gun started shooting, the man with the black gun shoved Shelton, searched his pockets, and grabbed a chain from around his neck. The man with the black gun pointed it at Turnbull and the baby. The two then ran past her, taking off their masks.

When the black gun was later found, no bullets had been fired. Only one mask was found.

Shelton died from multiple gunshot wounds. All the shots came from Martin's gun.

At trial, Mapp testified in his own defense. He said he did not plan to rob anyone. He cooperated with the police because he believed if he implicated Martin, they would return his mother's truck and let him go. He claimed the assistant State's Attorney had not read him the entire summary and he did not read it himself. He had the opportunity to read it. Mapp specifically denied hearing any sentence that implicated him as an accomplice. He admitted to hearing the attorney read every sentence that did not implicate him.

Mapp testified that on the night of the shooting, he, Martin, and Richardson set out to find a couple of girls Mapp knew at 3500 S. Lake Park. Richardson left them there and took the Rodeo to get his own girl friend. As Mapp and Martin walked towards the building, Martin produced a gun. He asked Mapp to hold it for a second. Mapp did not know Martin had a gun or why he had a gun. Martin put on a mask and ran up to Shelton. Mapp followed to tell Martin to stop. Martin fired his gun and Shelton dropped his keys. Mapp picked up the keys to give them to Shelton. Martin continued to shoot Shelton. Mapp got out of the way because he could not stop Martin.

Mapp then ran off. Martin followed him. Mapp threw away the gun and the keys. He took off his jacket when Martin told him to.

When Mapp was taken into custody the next day, he told the police he didn't know about any killing. Mapp said he told the police

this because he did not know Shelton was dead. At one point he said the police did not beat him. Later Mapp said one detective slapped him a couple of times. Mapp claimed the assistant State's Attorney told him if he gave a statement, he could go.

During rebuttal, the State's witnesses said no one made any promises in exchange for the statement. The assistant State's Attorney did not skip the sentences that incriminated Mapp. No one hit Mapp.

The jury learned during the trial that Martin was killed shortly after the incident. The circumstances of his death are not in the record.

The jury found Mapp guilty of murder and armed robbery.

OPINION

(1) Prosecution questions during jury selection

The shooter was dead. No witness said Mapp pulled the trigger. His conviction would have to be based on a theory of accountability. The prosecutors apparently were concerned that the jury would disregard the evidence and the law. There can be no other explanation for the questions they asked during jury selection.

Out of a total of 33 jurors interviewed during *voir dire*, the State asked 15 potential jurors about their views of accountability and felony murder principles. Eight served as jurors and one served as an alternate.

The State said to the first venireperson: "We're going to be talking about something called felony murder here. It's where somebody, in this case we believe the defendant, and others got together to commit a crime. And during the course of that crime a man was killed. Will you follow the law which talks about criminal responsibility for an individual where he is not necessarily the person who pulls the trigger?" Mapp did not object to this question. The venireperson served as a juror.

The State asked the next venireperson: "Do you have any problem with the law of criminal responsibility and one for the actions of another when you're part of that agreement?" Mapp's objection was overruled. The venireperson served as a juror.

The State asked another venireperson: "Do you have any problem with the law of criminal responsibility which talks about being responsible for the actions of another when you're part of the plan?" Mapp objected to the question. The court overruled. The venireperson asked to hear the question again. The State replied, "Do you have any problem with following the law of criminal responsibility?" The venireperson served as a juror.

The State asked another venireperson: "Do you have any problem with any of the things we have been talking about, about the law of criminal responsibility?" The venireperson's reply was nonresponsive. She was excused.

The State asked another venireperson: "Would you also follow the law of criminal responsibility? In this case we're not saying he's the shooter. Would you have any problems following the law of criminal responsibility that if he helped someone or aided someone in the commission of an offense like armed robbery, that he could be found guilty of murder for aiding in the commission and planning of that offense?" Mapp's objection was overruled. The State asked: "Do you have any problem with that concept?" When the venireperson said "no," the State followed up with: "Do you have any problem following the law of felony murder, which means that even if he didn't intend for the guy to be murdered during the armed robbery but someone else murdered him but the fact that he helped in the commission of the armed robbery means that he's guilty of murder? Do you have a problem following that law?" Mapp's objection was again overruled. The State asked, "You wouldn't have any problem following that; is that correct?" The venireperson served as a juror.

The State asked the next juror: "Would you follow the law of criminal responsibility, that if he aided in the commission or in the planning of an armed robbery, that he is guilty of murder as well? Do you have any problems following that law, sir, even though he's not the shooter?" Mapp did not object. The venireperson served as a juror.

The State later asked an entire panel of potential jurors: "Do you have any problems with the law of criminal responsibility? You're never going to hear anything about him being a shooter or anything like that, but do you have any problems with the law of criminal responsibility that if he aided in the planning or commission of an armed robbery then that makes him guilty of the murder? Do you have any problems with following that kind of law?" The State also asked the venire members: "According to the law it's called felony murder, that even if he didn't intend the person to be killed or shot, the mere fact that he participated and aided in the armed robbery makes him guilty of murder. Do you have any problems with that or anything?" Mapp's objection was overruled. Three of the venire members served as jurors.

The State had a long discussion with another venireperson:

"[THE STATE]: Would you have any problems about the law of criminal responsibility? You probably heard me out there when I was asking everyone else. Would you have any problems with

we're not going to say he's the shooter in this case but we are going to prove or show that he aided in the planning and in the commission of an armed robbery wherein someone died which makes him guilty of murder? Would you have any problems following that law?"

[Defense Counsel]: Objection

THE COURT: Objection noted. Overruled.

[THE STATE] Q. Would you have any problems following that law?

A. No.

Q. Even though he's not the shooter, you don't have any problems following that law?

A. No.

Q. Would you have any problems following the law that says it doesn't matter whether he intended the guy to die or not or whether he knew that the other guy was going to shoot him, that he would still be guilty of murder? Would you have any problem with that law?

A. Did he know?

Q. Say he didn't even know the guy was shooting him. He's just along for the armed robbery. Even if he didn't know the guy was going to shoot him he's still guilty of murder? Do you have a problem with that?

A. I don't know about that. Yeah.

THE COURT: *** [T]here are no wrong answers. Just tell us what you feel.

[Venireperson]: Guilt by association, I don't know if I agree with that.

[THE STATE] Q. Would you still follow the law even though you don't agree to it?

A. Yeah.

Q. If you got instructed on the law, it says even though he didn't know the other guy was going to kill him but since he went along and participated in the armed robbery of the guy, that he would be guilty of murder?

A. That's what the law states.

Q. If that's what the law says would you follow that, sir?

A. You'd have to.

Q. Would you also follow it too if that's the law the way the judge instructs you?

A. Yes.

Q. I know it sounds kind of different. But is there any problems following that law?

A. No.

Q. No, sir?

A. No."

This venireperson did not serve on the jury.

The State examined a potential second alternate juror, but apparently not in the presence of jurors already selected and sworn. The State asked: "Do you understand what my partner was talking about when he asked the other people in the jury box about the law of criminal responsibility? \*\*\* That when you're part of the plan when you set up an armed robbery with other people and you get guns and masks and things you can be found to be responsible for that crime even though somebody else is the one who actually did the shooting?" The venireperson served as second alternate.

■ Supreme Court Rule 234 tells us that questions to the jurors "shall not directly or indirectly concern matters of law or instructions." 134 Ill. 2d R. 234. The rule is made applicable to criminal cases by Rule 431.

The supreme court has said: "The purpose of the *voir dire* examination is to assure selection of an impartial jury; it is not to be used as a means of indoctrinating a jury, or impaneling a jury with a particular predisposition." *People v. Bowel*, 111 Ill. 2d 58, 64, 488 N.E.2d 995 (1986). This court has said that *voir dire* should not be converted into a " 'vehicle for pre-educating and indoctrinating prospective jurors as to a particular theory or defense or impanelling a jury with particular predispositions.' " *People v. Kendricks*, 121 Ill. App. 3d 442, 449, 459 N.E.2d 1137 (1984), quoting *People v. Phillips*, 99 Ill. App. 3d 362, 369 (1981).

Despite the clear language of the rule, and the judicially pronounced purpose of the jury selection process, reviewing courts continue to deal with attempts by prosecutors and defense lawyers to preeducate jurors on matters of law. At times, Rule 234 has been honored in the breach.

■ A trial court does not abuse its discretion during *voir dire* where the questions to jurors create "a reasonable assurance that any prejudice or bias would be discovered." *People v. Dow*, 240 Ill. App. 3d 392, 397, 608 N.E.2d 259 (1992).

The supreme court has held that Rule 234 is not offended when judges ask, as they must, whether potential jurors understand the defendant is presumed innocent, the State has the burden of proving guilt beyond a reasonable doubt, and the defendant's failure to testify cannot be held against him. *People v. Zehr*, 103 Ill. 2d 472, 469 N.E.2d 1062 (1984). Ordinarily, a defense lawyer's questions concerning a specific defense will be excluded. *Bowel*, 111 Ill. 2d at 64 (questions about beliefs concerning mistaken identity); *People v. Dunum*, 182 Ill. App. 3d 92, 101, 537 N.E.2d 898 (1989) (questions about beliefs

concerning self defense); *People v. Byer*, 75 Ill. App. 3d 658, 670, 394 N.E.2d 632 (1979) (questions about compulsion defense).

The defendant does have a right to have jurors questioned about their willingness to follow the law on the insanity defense. *People v. Stack*, 112 Ill. 2d 301, 493 N.E.2d 339 (1986).

Why questions about the insanity defense but not compulsion or self-defense? The supreme court supplied the answer: "the jury was going to be asked to apply an extraordinarily controversial legal requirement against which many members of the community may have been prejudiced." *Stack*, 112 Ill. 2d at 312. That is, the insanity defense is a "subject of intense controversy," and simply asking jurors whether they could faithfully apply the law as instructed was not enough to reveal juror bias and prejudice toward that defense. *Stack*, 112 Ill. 2d at 313.

In an aggravated battery case, *People v. Lanter*, 230 Ill. App. 3d 72, 73, 595 N.E.2d 210 (1992), where the defense was intoxication, the defense lawyer asked a juror: " '[D]o any of you have any feelings concerning the use of alcohol or drugs which could affect your ability to be a juror in this case, if there were testimony about alcohol or drugs?' " The State's objection was sustained. Citing *Stack*, the court reversed the defendant's conviction, holding that the defense was controversial enough to justify the inquiry. Sustaining the objection prevented the defendant from intelligently exercising his peremptory challenges. *Lanter*, 230 Ill. App. 3d at 75. Earlier, in *People v. Murawski*, 2 Ill. 2d 143, 147, 117 N.E.2d 88 (1954), an abortion case, the court held it was error to bar the defense question: "Are you of the opinion that an abortion should never be performed?"

Prosecutors, too, may inquire into the possible biases of prospective jurors. We recently held that the trial court did not abuse its discretion when it allowed the State to ask whether any of the prospective jurors would be unable to be fair and impartial because some witnesses were involved in interracial relationships. *People v. Clark*, 278 Ill. App. 3d 996, 664 N.E.2d 146 (1996). In *Clark* we noted that people of all races "have strong negative feelings about interracial relationships." *Clark*, 278 Ill. App. 3d at 1004.

In *People v. Faulkner*, 186 Ill. App. 3d 1013, 542 N.E.2d 1190 (1989), the State was permitted to ask jurors whether they would be prejudiced by the lack of a body in a murder case. And in *People v. Freeman*, 60 Ill. App. 3d 794, 799-800, 377 N.E.2d 107 (1978), it was not error for the prosecutor to ask a prospective juror: "[Would you] find it difficult in your own mind to find a verdict of guilty if a good portion of the evidence which you heard is what is called circumstantial evidence?"

Some State questions to prospective jurors have gone too far. In *People v. M.D.*, 231 Ill. App. 3d 176, 197, 595 N.E.2d 702 (1992), the trial judge was in error when he allowed prosecutors to repeatedly ask jurors whether hearing two versions of events would automatically create reasonable doubt in their minds. Questions about whether jurors believed people had a natural impulse to confess their wrongdoings or whether murder of a family member could be a solution to family problems were held improper in *People v. Bell*, 152 Ill. App. 3d 1007, 1017-18, 505 N.E.2d 365 (1987). And in *People v. York*, 93 Ill. App. 2d 180, 181-82, 235 N.E.2d 159 (1968), it was error to allow the prosecutor to ask: "Do you know any attorneys that practice law as far as defense of criminals is concerned?"

The first question we must decide is whether the law of accountability is a subject jurors can be asked about, bearing in mind that the scope of *voir dire* is a matter for the trial judge's "broad discretion." *Dow*, 240 Ill. App. 3d at 396.

We have examined the cases where questions about the law of accountability became an issue during jury selection.

In *People v. Lykins*, 65 Ill. App. 3d 808, 382 N.E.2d 1242 (1978), the trial judge asked prospective jurors if they would follow the law of accountability. The court seemed to hold the questions violated Rule 234, but that the error was not reversible.

The defense asked the trial judge to inquire into juror attitudes towards accountability and identification evidence in *People v. Washington*, 104 Ill. App. 3d 386, 432 N.E.2d 1020 (1982). The judge refused. Finding no abuse of discretion, the court said: "There is no reasonable likelihood that potential jurors will have fixed opinions or biases concerning either identification evidence or the law of accountability." *Washington*, 104 Ill. App. 3d at 391.

The supreme court spoke briefly on the subject in *People v. Davis*, 95 Ill. 2d 1, 18, 477 N.E.2d 353 (1983). There, the prosecutor asked two prospective jurors who later were selected:

" '*** The Court will instruct you about this, this aspect of the law, that a person can be held accountable and responsible for the acts of another. Would it affect your ability in deciding this case on the issue or the charge of murder provided that the law states that the defendant could be held accountable under the facts that the defendant, this defendant before you, did not do the direct act, did not pull the trigger of the gun so to speak, that caused the death of the individual. Do you think that would affect your ability to decide or could you follow that law?' " 95 Ill. 2d at 18.

The court held that the prosecutor did not instruct the jury as to the applicable law. "Rather," said the court, "he merely inquired as

to whether the jurors could follow the law even if the evidence revealed that the defendant did not actually do the shooting." *Davis*, 95 Ill. 2d at 18. There was no error.

A defense request to ask jurors whether the defendant being at the scene of the violence would create an assumption that he probably is guilty was refused by the trial judge in *People v. Nunn*, 184 Ill. App. 3d 253, 273, 541 N.E.2d 182 (1989). The court held there was no error because the suggested questions were intended to test the jurors' understanding of the law of accountability before they were instructed on accountability principles.

Finally, in *People v. Johnson*, 276 Ill. App. 3d 656, 659 N.E.2d 22 (1995), we held it was not error to allow the prosecutor to briefly recite accountability principles and inquire whether potential jurors could follow the law relating to those principles.

■ Given these decisions, we conclude, despite the proscription of Rule 234, that potential jurors may be given a brief and fair summary of accountability principles and then be asked if they could properly apply those principles to the evidence. The purpose of the inquiry is "to discern fundamental bias or misperception of the prospective jurors." *Nunn*, 184 Ill. App. 3d at 273. The matter is within the trial judge's discretion.

Concluding that some inquiry about accountability may be appropriate ·is not a condonation of the questions asked in this case. These prosecutors went far beyond a search for fundamental bias or misperception of accountability principles. No reported decision supports the questions that were asked in this case.

We have set out in some detail the questions asked and the statements made. They include the prosecutor's personal opinion ("somebody, in this case we believe the defendant, and others got together to commit a crime"), muddled statements of law ("Do you have any problem with the law of criminal responsibility and one for the actions of another when you're part of that agreement?"), incomplete and misleading statements of law ("Would you have any problems following the law that says it doesn't matter whether he intended the guy to die or not or whether he knew that the other guy was going to shoot him, that he would still be guilty of murder?"), and inappropriate previews of the evidence ("That when you're part of the plan, when you set up an armed robbery with other people and you get guns and masks and things you can be found responsible for the crime even though somebody else is the one who actually did the shooting?").

■ This was indoctrination and conditioning, pure and simple. The jurors were being asked to prejudge the facts. It was a prelimi-

nary final argument. The defense lawyer kept objecting. The trial judge never should have allowed the questions. It was an abuse of discretion. Rule 234, whatever else it means, grants the trial judge primary responsibility for conducting the jury selection process. He should accept that responsibility.

We must consider the impact of the error. This is not a case where a juror deceives or misleads the defendant, giving answers that hide a disqualifying fact or state of mind. See *People v. Green*, 282 Ill. App. 3d 510, 668 N.E.2d 158 (1996); *People v. Mitchell*, 121 Ill. App. 3d 193, 459 N.E.2d 351 (1984); *People v. Oliver*, 50 Ill. App. 3d 665, 365 N.E.2d 618 (1977). In those instances the right to a fair trial is compromised and there can be no harmless error.

We have carefully reviewed the record. The properly admitted evidence in this case was so overwhelming that no fair-minded trier of fact could reasonably have voted to acquit the defendant. See *People v. Carlson*, 92 Ill. 2d 440, 449, 442 N.E.2d 504 (1982). We conclude, as the court did in *M.D.*, 231 Ill. App. 3d at 197, that the error resulting from the prosecutors' questions was harmless beyond a reasonable doubt.

(2) The prosecution's final argument

■ Not content with a detailed, signed confession and the corroborating testimony of three eyewitnesses, the prosecutor said in final argument:

> "This man is Larry Shelton [the victim]. He should have had the chance to see his two-month old boy learn to crawl, learn to walk, learn to speak. He should have had the opportunity to see his daughters grow up and become young women.
>
> THE COURT: All right. State, move on from that part of it, all right?
>
> THE STATE: And the chance to spend his life with Stephanie [victim's fiancée].
>
> Defendant: Objection.
>
> THE COURT: All right. I've directed the State to move on.
>
> THE STATE: But that's all gone now. It's all gone because of meanness."

The prosecutor's remarks had nothing to do with the issues in the case. They were a blatant appeal to the jurors' sympathy and emotions. Similar remarks were described as "improper, inexcusable and unprofessional" in *People v. Bartall*, 98 Ill. 2d 294, 323, 456 N.E.2d 59 (1983). There is nothing new about judicial condemnation of these kinds of remarks about the family left behind. See *People v. Hope*, 116 Ill. 2d 265, 277-78, 508 N.E.2d 202 (1986); *People v. Bernette*, 30 Ill. 2d 359, 371, 197 N.E.2d 436 (1964); *People v. Beringer*,

156 Ill. App. 3d 309, 314-15, 509 N.E.2d 578 (1987); *People v. Littlejohn*, 144 Ill. App. 3d 813, 827-28, 494 N.E.2d 677 (1986). By now, the point should have been made.

The trial judge in this case immediately recognized the impropriety of the prosecutor's remarks. Unfortunately, the only thing he did about him was to say "move on." We doubt that "move on" signified official disapproval of the remarks to the jury. We also note that the prosecutor, with impunity, twice ignored the directive to "move on."

The defendant points to another instance of improper final argument by the State. During rebuttal, the prosecutor said:

"No question Joe Martin [the shooter] is a bad guy. He probably got what he deserved, however he passed away or whatever. I'm sure there is no love lost for Joe Martin. But also remember, birds of a feather stick together."

The "birds of a feather" remark was an improper guilt-by-association contention (*People v. Ong*, 94 Ill. App. 3d 780, 790, 419 N.E.2d 97 (1981)), and the trial judge erred when he overruled the defense objection to it.

Again, we face the dilemma of what to do about serious prosecutorial misconduct where the overwhelming evidence points to the defendant's guilt. We note that the defendant makes no claim of error concerning the stages of the trial where evidence was presented. We reluctantly conclude, as the supreme court did in *Bartall*, 98 Ill. 2d at 323, that the improper remarks most likely did not play a role in the jury's return of a guilty verdict. Also see *People v. Free*, 94 Ill. 2d 378, 414-15, 447 N.E.2d 218 (1983).

(3) The defendant's sentence

■ Mapp contends his sentence was excessive. Because he did not file a written motion challenging the sentence (730 ILCS 5/5—8—1(c) (West Supp. 1995)), he has waived all but plain error. See *People v. McCleary*, 278 Ill. App. 3d 498, 663 N.E.2d 22 (1996).

The trial judge properly reviewed mitigating and aggravating facts. The sentence of 55 years is less than the maximum of 60 years. We see nothing in the record that indicates plain error or an abuse of discretion. See *People v. Illgen*, 145 Ill. 2d 353, 359, 583 N.E.2d 515 (1991).

CONCLUSION

Despite the unjustified and unnecessary prosecutorial misconduct in this case, the strength of the State's evidence convinces us beyond a reasonable doubt that the errors we have described did not affect the verdict of the jury. We caution that affirmance on harmless error

grounds must not be taken as a license for repetition of this misconduct in some future case.

Affirmed.

CAMPBELL, P.J., and BRADEN, J., concur.