NOTICE
Decision filed 11/01/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 180578-U

NO. 5-18-0578

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 17-CF-1177 |
| | ) | |
| DAVID A. CROWE, | ) | Honorable |
| | ) | Richard L. Tognarelli, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WHARTON delivered the judgment of the court.
Justices Cates and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*: Plain error review of the defendant's claim that the court erred in its method of questioning prospective jurors on the four Rule 431(b) principles is not appropriate where the evidence is not closely balanced. Although the court allowed prosecutors to ask prospective jurors some improper questions during *voir dire*, we find the error to be harmless beyond a reasonable doubt in face of the overwhelming evidence of the defendant's guilt. The court did not rely on improper evidence or an improper factor in sentencing the defendant.

¶ 2    The defendant, David A. Crowe, was convicted of one count of aggravated battery (720 ILCS 5/12-3.05(c) (West 2016)). The court sentenced him to 10 years in prison. He appeals, arguing that (1) the court did not fully comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), (2) the State improperly indoctrinated prospective jurors during *voir dire*, (3) the court considered improper and unreliable evidence in sentencing the defendant, and (4) the court

1

improperly considered a factor inherent in the offense in aggravation at sentencing. We affirm the defendant's convictions and sentences.

¶ 3                                                    I. BACKGROUND

¶ 4        In May 2017, the defendant was indicted on one count of aggravated battery (720 ILCS 5/12-3.05(c) (West 2016)) and one count of domestic battery (*id.* § 12-3.2(a)(1)). The indictment alleged that on April 13, 2017, the defendant struck his girlfriend, Jennifer Jones, on or about a public roadway, and caused her bodily harm.

¶ 5        The matter proceeded to trial in July 2018. Maureen Lane, who witnessed the events at issue from her front yard, testified for the State. Lane lived near the intersection of East Clay and North Aurora in Collinsville. She stated that she was mowing her front yard on the afternoon of April 13, 2017, when she saw a vehicle approach the intersection. Lane could hear the occupants of the vehicle arguing. She saw the car come to a sudden stop approximately two houses down the street from her. A man got out of the passenger side, walked around to the driver's side, and banged on the driver's door. He then got back into the car on the passenger side. Lane testified that she then saw a woman jump or fall out of the driver's side. Lane did not know whether the woman fell or was pushed, but she saw the woman land on the ground. Lane further testified that the man got out of the car again and he hit the woman at least 10 times using both hands. She could not recall whether he was striking the woman with closed fists or open hands. According to Lane, the woman was "screaming *** bloody murder" and attempting unsuccessfully to block the man's blows.

¶ 6        Lane screamed for someone to call 9-1-1. At trial, she explained that another neighbor was out in his front yard at the time. She also yelled at the man, telling him to stop. According to Lane, the man got back in the car and drove away. She testified that the woman crawled to the

2

curb, then stood up and started walking down the street, crying. The woman had red marks and bruises on her face, and her face was swollen. Lane also noticed that her shoulder was bleeding. She stated that the woman continued to walk north on North Aurora. Lane followed her and attempted to talk to her, but the woman kept walking and did not reply. Lane stated that she followed the woman until a police officer arrived and made contact with her.

¶ 7    Lane described the man involved in the incident as a "young white male, probably in his early 30s, [with] brown hair." She stated that she got a good look at his face. On cross-examination, Lane acknowledged that when she spoke to police, she described the man involved as being in his 20s. She also acknowledged that she did not see what occurred between the couple inside the vehicle.

¶ 8    The State introduced evidence of a 9-1-1 call. Dispatcher Kaitlyn Ferguson testified that at 2:30 p.m. on the day in question, she received a call from an employee of a trash collection company who reported seeing a man push a woman out of a white passenger vehicle. He described the woman as a white female wearing a black and white dress. A recording of the call was also played for the jury.

¶ 9    Officer Doug Talbot responded to the intersection of East Clay and North Aurora. He testified that based on the information he had received from dispatch, he looked for a woman in a black and white dress walking north. He saw a woman matching that description walking north on North Aurora, followed closely by another woman. Talbot identified the woman in the black and white dress as Jennifer Jones, and he identified the woman following her as Maureen Lane.

¶ 10    Talbot testified that he first attempted to talk with Jones to determine what happened. He stated that she was "not uncooperative," but she was also not "forthcoming." He explained that although she answered his questions, she gave "short responses." Talbot attempted to convince

3

Jones to tell him what happened by telling her that whoever struck her should be held accountable and that she did not deserve what happened. Asked how Jones responded, Talbot stated that she just cried and did not tell him what happened. When asked to describe Jones's injuries, Talbot stated that she had a black eye with some redness surrounding it on her left eye. He took photographs of her injuries, which were introduced into evidence.

¶ 11    Talbot further testified that after speaking with both Jones and Lane, he searched the area for the vehicle involved in the incident. He then drove past the defendant's residence to see if the vehicle was parked there, which it was not. Talbot explained that he was familiar with the defendant from prior encounters.

¶ 12    Talbot next testified that he returned to the police station. Approximately 15 minutes later, the defendant called the police station and spoke to Talbot. According to Talbot, the defendant asked if he was going to be arrested and whether Talbot wanted to speak with him. In response, Talbot told the defendant that he needed to ask him about an incident involving Jones. Initially, Talbot testified that the defendant specifically asked if Talbot wanted to speak with him about Jones. On cross-examination, however, he admitted that he could not recall whether he or the defendant mentioned Jones's name first. Talbot further testified that in spite of the phone call, the defendant did not come to the police station to discuss the incident.

¶ 13    Jones testified briefly for the State. She stated that she was in a dating relationship with the defendant for approximately four months, including in April 2017. She further testified that she spent "part of the day" with the defendant on April 13, 2017, and that at some point they were in her vehicle at the intersection of East Clay and North Aurora in Collinsville. Jones stated that although she was no longer dating the defendant at the time of trial, she still loved him. She was not asked about the events at issue by either party.

4

¶ 14    The State next presented evidence of other similar conduct by the defendant, including a prior conviction for a 2011 domestic battery and testimony concerning an incident that occurred between the defendant and Jones only three days after the charged incident. Andrew Karraker, who called police after witnessing an altercation between a man and a woman in a white vehicle, testified that he saw the man striking the woman inside the vehicle. He stated that the man then got out of the car and "stormed off." Karraker admitted that he could not see what went on inside the vehicle very well. Responding officer Jeremy Hosto testified that when he arrested the defendant, the defendant acknowledged having an argument with his girlfriend. Hosto's partner, Sergeant Norton Miller, spoke with Jones. He testified that Jones had two black eyes, one of which appeared to be a fresher injury than the other. He took photographs of her injuries, which were admitted at trial. Miller further testified that Jones showed him a broken tooth. Miller subsequently interviewed the defendant, who told him that the incident in which Jones's tooth was broken occurred in Missouri.

¶ 15    The defendant did not present any evidence. The jury returned verdicts of guilty on both charges. The defendant filed a posttrial motion, which the court denied. The court subsequently sentenced the defendant to 10 years in prison on the charge of aggravated battery and 6 years on the charge of domestic battery, to be served concurrently. The defendant filed a motion to reconsider sentence. After a hearing on that motion, the court vacated the domestic battery conviction and sentence, finding that it merged with the charge of aggravated battery; however, the court otherwise denied the motion. This appeal followed. We will discuss additional background information as needed in our discussion of the issues the defendant has raised.

¶ 16                                II. ANALYSIS

¶ 17    The defendant challenges his convictions, arguing that (1) the court did not fully comply with Rule 431(b) and (2) he was denied a fair trial because the State indoctrinated prospective jurors during *voir dire*. He also challenges his sentence, arguing that (1) the court erroneously considered police reports and orders of protection without adequate evidence of their reliability and (2) the court considered serious bodily harm to Jones, a factor that he contends is inherent in the offense, as a factor in aggravation. We address each of the defendant's contentions in turn.

¶ 18                               A. Rule 431(b)

¶ 19    The defendant first argues that the court did not fully comply with Rule 431(b) during *voir dire*. He acknowledges that he did not object to the court's questioning, thereby forfeiting appellate review of the claimed error. See *People v. Belknap*, 2014 IL 117094, ¶ 47. He urges us to consider his argument under the plain error doctrine, arguing that the evidence in this case was closely balanced. See *People v. Sebby*, 2017 IL 119445, ¶ 52 (holding that 431(b) errors can only be reviewed under the plain error doctrine in cases where the evidence is closely balanced absent evidence that the error resulted in a biased jury). We decline to do so.

¶ 20    The plain error doctrine allows appellate courts to consider arguments that have been forfeited under two circumstances. First, we may review a claim that has been forfeited if the evidence was so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error. Second, we may review a claim of an error so fundamental that it undermined the fairness of the defendant's trial and threatened the integrity of the judicial process, regardless of the strength of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). As stated previously, however, Rule 431(b) errors are cognizable only under the first prong of the plain error review—*i.e.*, where the evidence is

6

closely balanced—unless there is evidence that the error resulted in a biased jury. *Sebby*, 2017 IL 119445, ¶ 52.

¶ 21 Rule 431(b) requires trial courts to explain the following four principles of law to prospective jurors during *voir dire*: (1) the defendant is presumed innocent of the charges against him, (2) the State must prove the defendant's guilt beyond a reasonable doubt, (3) the defendant is not required to present any evidence, and (4) the defendant is not required to testify, and jurors may not draw any negative inferences from a defendant's decision not to testify. Ill. S. Ct. R. 431(b) (eff. July 1, 2012). The rule further requires courts to ask all prospective jurors whether they both understand and accept each of these principles. *Id*. The court's method of inquiry must provide all prospective jurors with an opportunity to indicate to the court whether they both understand and accept each principle. *People v. Thompson*, 238 Ill. 2d 598, 607 (2010).

¶ 22 In this case, the court began by providing the prospective jurors with a single detailed statement incorporating all four principles. The court then stated as follows:

"These are very important principles in our criminal justice system, not only in our country but in this State. So I want to go over those again with each of you. And again, number 1, the Defendant is presumed innocent of the charges against him.

Number 2, that before a Defendant can be convicted, the State must prove the Defendant's guilt beyond a reasonable doubt.

Three, the Defendant is not required to offer any evidence on his own behalf.

And the Defendant's failure to testify, should he choose not to, cannot be held against him.

Four basic principles in our criminal justice system. Does everyone understand and accept those four principles?"

7

The prospective jurors nodded their heads. The court then asked, "I am looking in the jury box. Everyone is nodding their head there. How about in the audience? Do you understand and accept those four principles?" The prospective jurors again nodded.

¶ 23    In *People v. Birge*, 2021 IL 125644, ¶ 34, our supreme court held that Rule 431(b) does not require courts to explain the four principles separately. The court also emphasized that "[t]he rule plainly states that the court can ask the questions to the potential jurors as a group, and the rule does not require that their response be conveyed orally." *Id.* ¶ 27. The defendant argues, however, that there were two key flaws in the court's method of questioning in this case. First, he notes that the court questioned the entire venire simultaneously, and only asked them to nod their heads. The defendant argues that this method was inadequate because it was impossible for the court to be certain that all prospective jurors were nodding. Second, he points out that later in *voir dire*, when the attorneys were questioning prospective jurors, one prospective juror told the prosecutor that she was unable to hear a question the prosecutor had posed earlier because she was "too far back." The defendant asserts that it is equally possible that not all of the prospective jurors heard the court's explanation of the four principles.

¶ 24    We need not resolve the defendant's arguments, however. Even assuming the court erred, we find plain error review to be inappropriate because we find that the evidence was not closely balanced. The defendant argues that the evidence was close because neither the 9-1-1 caller nor the eyewitness, Lane, were able to identify the defendant as the man they witnessed striking Jones. We are not persuaded.

¶ 25    Undisputed evidence established that Jones and the defendant were involved in a dating relationship when the incident occurred, and that Jones was with the defendant in her vehicle in the vicinity of East Clay and North Aurora on the day in question. Undisputed evidence also

8

showed that the defendant contacted the police department before Officer Talbot was able to contact him, thus demonstrating an awareness of his guilt. Undisputed evidence showed that Jones was reluctant to provide Officer Talbot with any details concerning the incident, which provides context for the State's decision with the defendant not to ask her any substantive questions about the incident. Finally, the jury was presented with evidence that the defendant had engaged in two other acts of domestic violence, including a strikingly similar incident involving Jones only three days after the incident that led to the charges in this case.

¶ 26    We recognize that, although Lane testified that she got a good look at the face of the man she observed striking Jones, she was not asked to identify him in court at the trial. In the face of the evidence we have just described, however, we cannot agree with the defendant that the evidence was closely balanced because of this omission. The man Lane saw striking Jones was riding in a vehicle driven by Jones, making it extremely unlikely that the crime was committed by a random stranger. Considering the evidence as a whole, we do not believe it is closely balanced. We therefore conclude that plain error review of the defendant's claim is not warranted.

¶ 27                                    B. Jury Indoctrination

¶ 28    The defendant next argues that the lead prosecutor was allowed to preview the State's theory of the case and indoctrinate prospective jurors through her questions during *voir dire*. During a side-bar conference, the defendant objected to questions related to the credibility of "independent witnesses," and he later moved for a mistrial on the basis of these questions. The court denied the motion. The defendant argues that this ruling was in error.

¶ 29    In questioning the first panel of prospective jurors, the prosecutor explained that the Madison County State's Attorney's office has a policy of pursuing charges of domestic violence

9

whether or not the victim wants to do so. She then asked the prospective jurors whether they accepted that and whether they had any problem finding the defendant guilty if the State proved its case even though the victim was not interested in pressing charges. In answering these questions, one of the prospective jurors noted that victims of domestic violence might not want to cooperate because they do not want to get their romantic partners in trouble. The prosecutor asked the juror to repeat those comments. She asked other prospective jurors if they could think of other reasons why a victim of domestic violence might not want to leave her abuser or cooperate with prosecutors.

¶ 30    At one point, the prosecutor told prospective jurors, "I do believe that you are going to hear evidence in this case that the victim in this case abuses drugs." She questioned members of the first panel whether they thought there was a correlation between drug use, having had a "rough life," low self-esteem, and being the victim of domestic abuse.

¶ 31    She went on to say, "So in talking a little bit more about domestic violence, domestic violence used to be like what happens in a home should stay in a home kind of thing." She then questioned the panel about whether they thought this had changed. In responding, one of the jurors stated that attitudes had changed because there was more awareness of the issue of domestic violence. The prosecutor then said, "In speaking about awareness, *** I can think of the Ray Rice video with the young lady being struck in the elevator. He is an NFL player, if any of you [have] seen that." She asked the prospective jurors if they were familiar with the video and whether they recalled that the victim did not cooperate. She then asked, "But you saw for yourself by looking at the video?"

¶ 32    The prosecutor next addressed the concept of circumstantial evidence. She asked: "If you were to leave a cake on the countertop in your home and you were to come into the kitchen and it

10

is gone, and your dog has frosting on its face, what is it that you would think happened to that cake?" One of the panel members replied that the dog ate the cake. The prosecutor explained that this is "circumstantial evidence." She then asked the prospective jurors if they felt they could be good at assessing circumstantial evidence.

¶ 33    The prosecutor moved on to the topic of judging the credibility of witnesses. After asking a few general questions concerning the prospective jurors' ability to judge whether a person is telling the truth, the following exchange took place:

"MS. DAVIS [(ASSISTANT DISTRICT ATTORNEY)]: If I said the word independent witness to you, what does that cause you to think of?

PROSPECTIVE JUROR 1: Maybe someone who is not tied to either side of the case.

MS. DAVIS: Somebody who doesn't have a stake in it?

PROSPECTIVE JUROR 1: Yes.

MS. DAVIS: Would you judge the testimony of an independent witness with a higher regard than perhaps the testimony of an alleged victim of domestic violence?

PROSPECTIVE JUROR 1: I don't think so.

MS. DAVIS: If you were to hear the testimony of an independent witness who said it is somebody who doesn't really have a say in it, would you judge that testimony— would you give it a lot of credibility?

PROSPECTIVE JUROR 1: Yeah."

¶ 34    Defense counsel then questioned the first panel. She inquired, "The State just discussed with you the idea that, how would you feel about an uncooperative victim. Did the conversation with the State just now make you think that the defendant is guilty?" When all four panel

11

members indicated that it did not, counsel asked if they would hold prosecutors to a lesser burden or "cut them any slack" if the victim was uncooperative. All panel members shook their heads.

¶ 35 At this point, both parties began to exercise their peremptory challenges and new prospective jurors were added to the panel to take the place of those who were excused. The lead prosecutor questioned the new panel members about whether they are comfortable with the State prosecuting a domestic violence case even though the victim does not wish to press charges. She then asked one of the prospective jurors who was added to the panel whether he could judge the testimony of an independent witness "with the understanding that they have no motivation to be here and testify." The prospective juror asked the prosecutor if she was referring to a psychiatrist as a witness. In response, she explained that she anticipated testimony of a witness who "saw something happen but did not know either the defendant or the alleged victim in this case." She then asked if the prospective juror could judge the credibility of this witness "with the understanding that they don't have a stake in" the case.

¶ 36 In questioning the second panel of prospective jurors, the prosecutor hit on the same themes. She asked if they had seen the Ray Rice video and whether they were surprised that the woman in the video did not press charges. She asked if they thought there was a "different dynamic" in cases of domestic violence than in other cases involving violence. She asked if the cake analogy made sense. She asked whether the panel members understood what she meant by the term "independent witness." She then asked if they would consider the testimony of an independent witness credible. She asked one prospective juror if she would find the testimony of an independent witness more credible than the testimony of a person involved in the events at issue.

12

¶ 37    Questioning of the third panel of prospective jurors proceeded in much the same manner. This time, the prosecutor did not ask about the Ray Rice video. During the State's questioning, the following exchange took place:

> "MS. DAVIS: Would it matter to you in a case like this if there were to be somebody who would testify who didn't have a stake in the case at all? So you would judge their testimony the same way you would anybody else?
>
> PROSPECTIVE JUROR 16: Yes.
>
> MS. DAVIS: It doesn't matter to you that nothing depended on the outcome of the case for them?"

The prosecutor asked a few of the other prospective jurors individually whether they would find the testimony of an independent witness to be more credible than that of the victim of domestic violence. Defense counsel followed up by asking some of the jurors whether they would find a victim of domestic violence not to be credible.

¶ 38    Defense counsel did not object to most of these questions. At one point, however, she requested a side-bar, which was held off the record. During the trial, the defense moved for a mistrial. In arguing that motion, defense counsel stated that she had objected during *voir dire* to the State's questions to jurors concerning the credibility of an independent witness. Counsel argued that the State's line of questioning on this topic had the effect of telling jurors in advance that they should have a preconceived notion regarding the credibility of certain witnesses. In response, the prosecutor first pointed out that the court would instruct the jury to consider factors such as bias and motive in assessing the credibility of witnesses. She argued that her questions were in line with this principle. She also emphasized that the defense had the opportunity to use a peremptory challenge to strike the juror being questioned when the objection was raised. She

argued that the defense forfeited any claim by failing to strike the juror. Defense counsel stated, "Judge, my motion for a mistrial is not related to that juror sitting on the jury. The objection is related to the issue that we raised during that side bar which is that the jury was improperly advised in the course of jury selection as to how to weigh evidence." The court denied the motion.

¶ 39 On appeal, the defendant argues that (1) the State used the cake hypothetical to encourage jurors to assume that it was the defendant who attacked Jones; (2) the State encouraged jurors to have sympathy by Jones by questioning jurors in a way that portrayed her as a woman with low self-esteem who had led a difficult life and who was afraid to testify against the defendant; (3) the prosecutor made multiple references to the Ray Rice video and "compared this case" to the violent incident captured in that video; and (4) the State repeatedly told jurors that they should begin the trial with the belief that its "independent witnesses" were more credible than Jones. As the State points out, the defendant's only objection to the State's *voir dire* questions addressed the questioning concerning the credibility of independent witnesses. By objecting on this specific ground at trial, the defendant has forfeited the arguments he makes on appeal regarding other grounds for objection. See *People v. Barrios*, 114 Ill. 2d 265, 275 (1986). Thus, we may only consider the first three of these arguments if we find that they constitute plain error. With this in mind, we turn our attention to the substance of the defendant's contentions.

¶ 40 The purpose of *voir dire* is to ensure the selection of a fair and impartial jury. *People v. Bowel*, 111 Ill. 2d 58, 64 (1986). To that end, the goal of questioning prospective jurors "is to ascertain sufficient information about prospective jurors' beliefs and opinions so as to allow removal of those members of the venire whose minds are so closed by bias and prejudice that they cannot apply the law as instructed." *People v. Cloutier*, 156 Ill. 2d 483, 495-96 (1993).

14

Questions posed must be designed to serve this purpose and must not be used as a means of indoctrinating the jury. *People v. Rinehart*, 2012 IL 111719, ¶ 17.

¶ 41 There is no precise test to determine which questions will filter out biased or impartial jurors. *Id.* ¶ 16. "Rather than a bright-line rule" between proper questions and improper jury indoctrination, there is a continuum. *Id.* ¶ 17. Generally, broad questions are appropriate, while "[s]pecific questions tailored to the facts of the case and intended to serve as 'preliminary final argument' " are not. *Id.* (quoting *People v. Mapp*, 283 Ill. App. 3d 979, 989-90 (1996)). The scope of *voir dire* questioning is a matter within the discretion of the trial court. We review that court's ruling for an abuse of discretion. *Id.* ¶ 16.

¶ 42 We first consider the State's questions involving the cake analogy. Although the defendant argues that the State used the analogy to urge prospective jurors to assume the defendant was guilty, we think it is more accurately characterized as an illustration of what circumstantial evidence is. Generally, *voir dire* questions should not relate to issues of law or instructions the jury is likely to receive. *Mapp*, 283 Ill. App. 3d at 986. However, there is an exception to this rule "for matters of intense controversy" such as the insanity defense, the defense of intoxication, or abortion. *People v. Boston*, 383 Ill. App. 3d 352, 354 (2008); *Mapp*, 283 Ill. App. 3d at 987. Illinois courts have found that it is proper to ask prospective jurors about their willingness to find a defendant guilty based largely on circumstantial evidence. *Mapp*, 283 Ill. App. 3d at 987 (citing *People v. Freeman*, 60 Ill. App. 3d 794, 799-800 (1978)). The prosecutor in this case followed up her presentation of her cake analogy by asking jurors whether they understood what she meant by circumstantial evidence and whether they believed they could be good at assessing such evidence. We recognize that she illustrated the concept of circumstantial evidence with an example where the evidence was particularly strong—a dog with

15

frosting on his nose. However, she did nothing during *voir dire* to suggest that the circumstantial evidence in this case would be as obvious as the evidence that the dog ate the cake. The court did not abuse its discretion, much less commit plain error, by allowing this line of questioning.

¶ 43 In a similar vein, we find that questions about the reasons a victim of domestic violence may not want to press charges or cooperate with prosecutors are generally permissible because prospective jurors may have preconceptions about the State's decision to prosecute without the cooperation of the victim. See, *e.g.*, *Rinehart*, 2012 IL 111719, ¶¶ 18-21 (rejecting a similar argument concerning similar questions in a sexual assault case). However, it is possible for a line of questioning on a generally permissible topic to go too far. See, *e.g.*, *Mapp*, 283 Ill. App. 3d at 989. Here, the defendant argues that in questioning prospective jurors on this topic, the State impermissibly garnered sympathy for Jones and previewed the facts of its case.

¶ 44 As we noted earlier, the lead prosecutor in this case asked several prospective jurors if they could think of reasons a victim of domestic violence might not want to cooperate in prosecuting the abuser. Jurors responded by stating that the victim may still love the abusive partner, the victim might be afraid or embarrassed, or the victim might think the abuse is normal or something she deserves. In *Rinehart*, the Illinois Supreme Court upheld a similar line of questioning in a case involving a victim of sexual assault. There, the prosecutor asked several prospective jurors to think of reasons a victim of sexual assault might not report the assault immediately. *Reinhart*, 2012 IL 111719, ¶ 5. The prospective jurors' responses were similar to the responses of the prospective jurors in this case—they listed fear, shame, embarrassment, and a possible belief that " 'you would be a lesser person if something like that happened to you.' " *Id.* The supreme court found that these questions were proper because they were "focused on potential jurors' preconceptions about sexual assault cases, in an effort to uncover any bias

16

regarding delayed reporting and the credibility of a victim who informed no one about the alleged attack when it happened." *Id.* ¶ 21.

¶ 45    Here, although many of the State's questions were proper, we believe some of the questions went too far. In upholding the court's allowance of the questions at issue in *Rinehart*, the supreme court specifically noted that the prosecutor in that case "did not elaborate on the subject, but instead accepted the answers it received." *Id.* Here, the prosecutor accepted the answers she received from some prospective jurors and moved on. However, in other instances, she went further. For example, when one prospective juror revealed that a relative had left an abusive relationship with the help and support of her family, the prosecutor asked other members of the panel if they could understand why a victim without a supportive family might respond differently. She also informed prospective jurors that the case might involve evidence that Jones used drugs, and she then asked them if they could see correlations between drug use, low self-esteem, and domestic abuse. Thus, rather than merely accepting the prospective jurors' responses, as the prosecutor did in *Rinehart*, the prosecutor here actively encouraged prospective jurors to think of additional reasons a victim might not want to testify against her abuser.

¶ 46    We note that defense counsel offset some of the potential prejudice from these questions by asking prospective jurors whether their discussion with the prosecutor had led them to assume the defendant was guilty and whether they would hold the State to a lesser standard because the victim did not want to cooperate. Moreover, as we have already mentioned, the defense did not object to this line of questioning. Thus, while some of the State's questions concerning attitudes towards an uncooperative victim exceeded the bounds of proper *voir dire* examination, those questions do not rise to the level of plain error.

17

¶ 47    We reach a similar conclusion with respect to the State's questions about the Ray Rice video. Although the defendant argues that these questions compared the facts of this case to the video, the prosecutor did not ask questions about the contents of the video; instead, she focused on the fact that the victim in the Ray Rice case did not want to press charges. Although we do not find these questions to be improper *per se*, we also do not condone the State's choice to discuss the widely-seen violent video when it easily could have relied on questions with less potential for prejudice. We note that in response to questions about the video, one of the prospective jurors emphasized that the woman in the video was beaten badly. We recognize that the prosecutor did not ask for this opinion, but it illustrates the potentially inflammatory nature of the video. There were other, less potentially prejudicial ways to ask prospective jurors questions about any preconceived notions they might have about a victim of domestic violence who does not want to testify. However, the discussion of the video remained focused primarily on the issue of the victim's unwillingness to press charges and did not veer off into an examination of the contents of the video. Moreover, as we have already discussed, the defendant did not object to this particular line of questioning at trial. Thus, we do not find that the questions about the Ray Rice video constituted plain error.

¶ 48    Finally, we consider the defendant's argument that the court abused its discretion in allowing the State to question witnesses concerning the credibility of independent witnesses. As stated previously, the defendant did object to these questions at trial. He also addressed the issue in a posttrial motion. We agree that these questions were improper, but we find the error to be harmless beyond a reasonable doubt.

¶ 49    We find the questions improper for two reasons. First, even if the prosecutor's examination had been limited to neutral questions about whether prospective jurors could take

18

into account any motivation witnesses might have to lie when judging their credibility, as she claimed at trial, we do not believe this was a proper line of inquiry. As we stated previously, it is generally not proper to ask questions related to questions of law. See *Mapp*, 283 Ill. App. 3d at 986. Jurors are not likely to have preconceived notions about the credibility of witnesses who happen to observe a crime. Thus, we find that this area of inquiry does not come within the exception for matters of intense controversy. See *Boston*, 383 Ill. App. 3d at 354; *Mapp*, 283 Ill. App. 3d at 987.

¶ 50    Second, the prosecutor did not limit her inquiry to neutral questions. She repeatedly emphasized the fact that the term "independent witnesses" referred to witnesses who had no stake in the outcome of the case, and she explicitly asked some of the prospective jurors whether they would find an independent witness to be more credible than the victim of domestic violence. These questions were not geared to uncovering any potential bias prospective jurors may have held concerning the credibility of witnesses to crimes or any other topic; instead, they gave the prosecutor an opportunity to preview the argument she would make at trial concerning the credibility of some of the State's witnesses. The questions were blatantly improper.

¶ 51    We find the error to be harmless for two reasons. First, the potential for prejudice was minimized to a great extent because Jones did not testify at all about the substance of the offense. Thus, this case did not involve a contest of credibility between competing witnesses. Second, as we discussed earlier, the evidence of the defendant's guilt was not close. Although the court should have sustained defense counsel's objection to these questions, we do not believe any rational jury would have voted to acquit the defendant under the circumstances of this case.

19

¶ 52                    C. Evidence Considered at Sentencing

¶ 53    The defendant next argues that the court improperly considered 15 police reports and 4 orders of protection as aggravating evidence at sentencing. He argues that there was no evidence that the allegations in the documents themselves were reliable. He also emphasizes that the officer who testified about the contents of the police reports—Officer Talbot—did not have any personal firsthand knowledge of the events described in the reports. The defendant contends that, despite these flaws, the court relied heavily on the police reports to find that the defendant had an extensive criminal background, a factor the court emphasized in imposing the maximum sentence. We disagree.

¶ 54    At the sentencing hearing, the State called Officer Talbot as a witness in aggravation. Much of his testimony focused on the events described in 15 police reports, most of which involved incidents that occurred before he began working for the department. Talbot admitted that he did not have personal knowledge of the incidents. Although a few of the incidents led to convictions, many did not. Talbot also testified that call logs from the county jail showed that the defendant placed 86 calls to the home of Chester Moore, where Jones was living. Talbot testified that Moore spoke with him and asked him to ask the defendant to stop calling his home.

¶ 55    The court also considered the presentence investigation report (PSI). The PSI revealed that the defendant had 12 prior felony convictions, 17 prior misdemeanor convictions, 1 charge of truancy, and 5 probation violations, and that he received supervision for a misdemeanor charge of disorderly conduct. In addition, the defendant was charged with domestic battery in seven other incidents, but those charges were nol-prossed. The PSI also revealed that the defendant was adjudicated delinquent on five counts of arson, and that five other juvenile charges were filed against him and nol-prossed, including a charge of domestic battery. Finally,

20

the PSI indicated that four emergency orders of protection had been issued against the defendant, one of which led to a plenary order of protection.

¶ 56    At the beginning of the sentencing hearing, the defendant objected to two of his adult convictions and the five nol-prossed juvenile charges. He alleged that he was not involved in these offenses and speculated that there may have been some confusion because another prisoner named David Crowe was in the system. Over the State's objection, the court struck those offenses from the PSI. The defendant did not dispute any of the other charges listed in the PSI.

¶ 57    In announcing its sentencing decision from the bench, the court first stated that it reviewed the information in the PSI, which included 11 prior arrests for domestic battery. The court acknowledged that not all of those arrests led to convictions. The court then stated, "your criminal history in this case, Mr. Crowe, is more than significant. It's outstanding." The court also noted that four orders of protection were entered against the defendant and that he caused serious bodily harm to Jones. Finally, the court indicated that a lengthy sentence was necessary to deter similar conduct. As stated previously, the court sentenced the defendant to 10 years on the charge of aggravated battery and subsequently vacated the conviction on the charge of domestic battery. The 10-year sentence for aggravated battery is the maximum sentence permitted by statute. See 720 ILCS 5/12-3.05(h) (West 2016) (providing that aggravated battery is a Class 3 felony); 730 ILCS 5/5-4.5-40(a) (West 2016) (providing that the extended-term sentencing range for Class 3 felonies is 5 to 10 years).

¶ 58    The ordinary rules of evidence applicable at trial are relaxed at a sentencing hearing. *People v. Blanck*, 263 Ill. App. 3d 224, 234 (1994); *People v. Spears*, 221 Ill. App. 3d 430, 437 (1991). This provides the sentencing judge with "a wide range of information regarding the defendant's life, character, criminal history, and propensity to continue to commit other crimes."

21

*Spears*, 221 Ill. App. 3d at 437. The only requirements for the admissibility of evidence at sentencing are that the evidence be relevant and reliable. *Blanck*, 263 Ill. App. 3d at 234; *Spears*, 221 Ill. App. 3d at 437.

¶ 59    Although the defendant contends that the police reports admitted into evidence were a particularly unreliable type of hearsay, police reports are not *per se* inadmissible at sentencing. See *People v. Spicer*, 379 Ill. App. 3d 441, 467 (2007). Moreover, it is well established that sentencing courts may consider hearsay evidence. The fact that evidence is hearsay is relevant to its weight rather than its admissibility. *Id.* Whether hearsay evidence is reliable enough to be considered is a determination within the discretion of the trial court. *Id.* The trial court has broad discretion in determining what evidence to consider at sentencing. *People v. Jackson*, 149 Ill. 2d 540, 549 (1992).

¶ 60    At sentencing, the court may also consider evidence of criminal conduct for which a defendant has not been convicted. *Id.* at 548. Evidence of such conduct "should be presented by witnesses who can be confronted and cross-examined, rather than by hearsay allegations in the presentence report." *Id.* However, courts are *required* to consider information in the PSI. See *People v. Moran*, 2018 IL App (3d) 150754, ¶ 18; *People v. Walton*, 357 Ill. App. 3d 819, 821-22 (2005); *Spears*, 221 Ill. App. 3d at 436. A PSI is generally considered a reliable source of relevant information at sentencing even though it necessarily includes information that is hearsay or would otherwise be inadmissible at trial. *Blanck*, 263 Ill. App. 3d at 234-35. Although it is up to the defendant to object if he believes that the PSI contains information that is inaccurate (*People v. Powell*, 199 Ill. App. 3d 291, 294-95 (1990)), the court must also take care to ensure the accuracy of the information it relies on, including information in the PSI (*Jackson*, 149 Ill. 2d at 549; *Blanck*, 263 Ill. App. 3d at 235).

22

¶ 61    Here, the court explicitly referred only to the PSI in pronouncing sentence; he did not mention the police reports or Talbot's testimony. Thus, there is no indication that the court relied on the police reports or testimony in determining an appropriate sentence. See *People v. Kliner*, 185 Ill. 2d 81, 172 (1998); *Spicer*, 379 Ill. App. 3d at 465-66. The court struck the portions of the PSI to which the defendant objected at sentencing, and his argument on appeal focuses solely on the police reports and Talbot's testimony, not on the court's consideration of information in the PSI. Moreover, even if the court erred in considering information in the PSI concerning the defendant's prior arrests for domestic battery that did not result in convictions, we find that error to be harmless. See *Spears*, 221 Ill. App. 3d at 437-38. As we stated previously, the defendant had an extensive history of undisputed criminal convictions, providing ample support for the court's observation that his criminal history was "outstanding." As the defendant acknowledges, the court emphasized his extensive criminal history in pronouncing sentence. We are not convinced there is any likelihood that the court would have imposed a lesser sentence absent evidence of the defendant's prior arrests.

¶ 62                            D. Improper Sentencing Factor

¶ 63    Finally, the defendant argues that the court improperly considered a factor inherent in the offense of aggravated battery as a factor in aggravation. Specifically, he points to the court's statement during sentencing that the defendant was convicted of causing serious bodily harm to Jones. We are not persuaded.

¶ 64    As the defendant correctly points out, a court may not consider a factor that is inherent in the offense as a factor in aggravation at sentencing. *Spicer*, 379 Ill. App. 3d at 467. Consideration of such factors amounts to a double enhancement because the legislature already took those factors into account when it determined the appropriate sentencing range for the

offense. See *People v. Raney*, 2014 IL App (4th) 130551, ¶ 34. Battery can be elevated to aggravated battery based on many factors, including allegations that the defendant caused serious bodily harm. See 720 ILCS 5/12-3.05(a)(1) (West 2016). Here, however, the defendant was charged under subsection (c) of the aggravated battery statute, under which a battery is elevated to an aggravated battery based on the location of the offense. In this case, the indictment charged that the defendant struck Jones "on or about a public way." See *id.* § 12-3.05(c). Although the indictment alleged that the defendant caused "bodily harm" to Jones, serious bodily harm was not an element inherent in the offense as charged.[1] As such, the court did not err in considering serious bodily harm as a factor in aggravation.

¶ 65                                    III. CONCLUSION

¶ 66    For the foregoing reasons, we affirm the defendant's convictions and sentences.


¶ 67    Affirmed.

---

[1]Bodily harm—but not serious bodily harm—was an element of domestic battery as charged in count II of the indictment. See 720 ILCS 5/12-3.2(a)(1) (West 2016). As we explained earlier, the defendant's conviction on the charge of domestic battery was vacated by the court because it merged with the more serious charge of aggravated battery, which was based on the same conduct.