2022 IL App (2d) 190875-U
No. 2-19-0875
Order filed April 21, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 05-CF-724 |
| JOSE RODRIGUEZ-TELLEZ, | ) ) ) | Honorable Michael E. Coppedge, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE BRIDGES delivered the judgment of the court.
Justices McLaren and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held:*  The State did not violate defendant's right to an impartial jury by its examination at *voir dire*, and any violation of Illinois Supreme Court Rule 431(a) was not plain error. Accordingly, defendant's appellate counsel was not ineffective for failing to challenge the State's *voir dire* examination on direct appeal, and we affirm the trial court's dismissal of defendant's second-stage postconviction petition.

¶ 2    Defendant, Jose Rodriguez-Tellez, appeals from the second-stage dismissal of his postconviction petition. At issue is whether he made a substantial showing that his appellate counsel was ineffective for failing to argue on direct appeal that the State indoctrinated the jury to accept its theory of the case during *voir dire*, thereby violating his right to trial by an impartial

jury. Defendant also argues that the State's *voir dire* examination violated Illinois Supreme Court Rule 431(a) (eff. July 1, 2012). We affirm.

¶ 3                                     I. BACKGROUND

¶ 4      Following a jury trial, defendant was convicted on September 29, 2006, of the first-degree murder of Jose Medina. He was sentenced to a total of 60 years' imprisonment, which included a 25-year special enhancement for personally discharging a firearm that proximately caused Medina's death. See 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2006).

¶ 5                                     A. *Voir Dire*

¶ 6      Relevant to this appeal, the State asked versions of the following three questions to the prospective jury members.[1] The State's first question (the identification question), was:

> Do you believe that it is possible for a person to recognize another person without being able to describe that person?

The State occasionally continued with an example as follows:

> For example, if someone asked you what your cousin looked like, you might be able to give height, hair color, or eye color, but beyond that you might not be able to describe their nose, ear, lips, etcetera. When you saw your cousin, would you recognize them?

---

[1] Given that the State asked the three questions separately to various prospective jurors, the precise wording of the questions varied, and we therefore paraphrase the questions based on defendant's representation in his brief. Our review of the record confirms that defendant's summary of the State's questions is a substantially accurate representation of the questions actually posed to the empaneled jury members.

¶ 7    The State's second question (the credibility question) was:

> Do you believe that it is possible that a witness might lie in court even though they are under oath? Do you believe it's possible that a witness might lie under oath to protect someone?

¶ 8    The State's third and final question (the ABCD question) was:

> If the judge tells you that I have to prove the elements of the crime, and the elements of that crime are A, B, and C, but you have a question about D, but D is not something that I am required to prove to you, would you be able to set aside your question about D if I have proven to you A, B, and C beyond a reasonable doubt and vote guilty?

¶ 9    The State asked versions of the identification question to 10 of the empaneled jury members, the credibility question to 6 jury members, and ABCD question to all 12 jury members. Defense counsel also asked a variation of the ABCD question to several empaneled members— usually asking if the State had to prove D but failed to do so, whether the juror would vote not guilty. Defense counsel objected to one of the first instances of the identification questions and was overruled, but otherwise counsel did not contemporaneously object to the State's questions.

¶ 10                                   B. Defendant's Trial

¶ 11   We summarized the evidence adduced at defendant's trial in his prior appeal from the first-stage dismissal of his postconviction petition (2011 IL App (2d) 091230-U, ¶¶ 5-14), and we recite that summary *infra* ¶¶ 12-21.

¶ 12   On March 4, 2004, Jose Medina, a 33-year-old man, was found shot to death in his retail store in Harvard. Medina's two-year-old child, Alan, was inside the store at the time of the shooting but was not physically harmed.

¶ 13    At trial, Maria Hilda-Rivera, Medina's girlfriend and mother of Alan, testified that she found Alan crying inside the store and Medina dead on the floor. She went to the store after Medina did not answer her phone calls.

¶ 14    Valente Tellez, defendant's brother, testified that he was visiting defendant in the hospital a few weeks after the murder when an investigator came to interview defendant about Medina's murder. After the investigator left, defendant told Valente to dispose of some Adidas shoes. A few days later, defendant asked if he got rid of the shoes, and Valente had not. Defendant told Valente to throw the shoes into a creek near County Line Road. Valente had another conversation with defendant, which took place in June 2005. Valente asked defendant why the shoes had to be thrown out, and defendant replied that it "had to be done." Valente asked if the reason had to do with the murder, and defendant admitted that he had gone to the store that night and shot Medina. He told Valente that a "little kid" was in the store at the time of the shooting. Defendant told Valente that he had gone to the store after leaving a party, that he acted alone, and that he had "unloaded the whole gun" during the shooting. Valente knew that defendant had a broken right hand at the time of the murder and was right-handed but believed that defendant's fingers were free to move around in the type of cast he had. Defendant also stated that he wanted to leave Harvard because "he didn't want to be blamed for nothing that had to do with the cowboy store," and because he was having problems with his girlfriend. Defendant left Harvard about one week later and did not tell the family where he was going.

¶ 15    Dr. James Knavel, defendant's treating orthopedic surgeon, testified that he put a short arm cast on defendant on February 18, 2004. A short arm cast leaves the elbow free and extends past the wrist to the hand, leaving the fingers and thumb free. His notes indicated that defendant was able to "make a good fist" after the short arm cast was applied.

¶ 16    Maricela Adan, defendant's girlfriend at the time, testified that she was in Medina's store one week prior to the murder. Defendant waited for her outside. As Adan was looking at some clothing, Medina came up behind her, put his hands on her backside and stated that the clothing would look great on her. Adan pushed him away, purchased a CD, and left. She did not know whether defendant saw the incident. On the night of the murder, defendant drove her to a party around 5 or 6 p.m. Defendant got a phone call that made him hyper. Defendant left the party. Adan attempted to call him several times, but defendant never answered the phone. Defendant called Adan back at 9:42 p.m., and he told her that he had left the party to have his truck washed. In June 2005, defendant began crying and told her that he was leaving Harvard because he had done something "bad," and he knew who had killed Medina. Defendant denied that he committed the murder.

¶ 17    A video recorded interview that defendant gave to police while in Minnesota and its corresponding transcript were admitted into evidence. In that interview, defendant admitted that he committed a carjacking and shot Medina. He said that he was with Adan at a party and left the party to go talk to Medina because he saw Medina embrace his girlfriend at his store. Defendant argued with Medina and then eventually pulled out a pistol and shot Medina several times. He denied seeing anyone else in the store and denied stealing anything from the store. He went home after the shooting and later disposed of the murder weapon and another gun by wrapping the guns in a rag or t-shirt, placing them in a plastic bag, and burying the bag alongside a factory near his residence. Defendant admitted that he asked Valente to dispose of some shoes and other items following the murder.

¶ 18    Roberto Ramirez testified about being carjacked on February 24, 2004. On that day, Ramirez drove into his apartment complex parking lot and parked when a man approached his car.

The carjacker fired a gun into the ground during the incident. Ramirez was 90% certain that defendant was the man who carjacked him.

¶ 19 Defendant testified that he was 18 years old at the time of the murder, that he was born in Mexico, and that he completed the third grade. He stopped going to school in Mexico in order to help his grandfather on his farm. On March 3, 2004, he went to a party with Adan. He left the party alone to take his truck to a car wash. He returned to the party to pick up Adan, but she was already gone. He then went home. At that time, he had a cast on his right arm that came down to and covered his fingers. He eventually moved to Minnesota because he was having problems with Adan and some friends had a construction business there and offered him a job. He told police that he committed the murder in order to protect a friend and his brother, who were under arrest in Illinois. He denied that he was actually involved or that he committed the murder. He admitted asking Valente to dispose of some shoes for him after the murder but denied that it was because the shoes may have contained blood on them.

¶ 20 During closing arguments, the State made the following comments in rebuttal to defense counsel's arguments that raised questions about the State evidence:

"If the Judge instructs you that the State must prove the elements A, B, and C, beyond a reasonable doubt, will you be able to set aside any questions that you have about D and deliberate only on A, B and C?

***

Roberto Ramirez, the victim of the carjacking, could not provide specific enough details to create a composite picture of his assailant. D.

You heard from Roberto Ramirez, who two and a half years after encountering his assailant in a dark parking lot, with a gun, at one o'clock in the morning after work, told you that he was ninety percent sure that this guy was the guy.

> He couldn't tell them exactly where his ears were, or where his nose was, or what the shape was, or how thin it was, how thick it was. D."

¶ 21 The State made similar statements regarding other evidence that defense counsel attacked, such as a fingerprint on a wine glass in the victim's refrigerator that did not match defendant's fingerprint.

¶ 22                    C. Direct Appeal and Postconviction Proceedings

¶ 23 On defendant's direct appeal, he argued that his sentence was excessive, and this court affirmed. *People v. Rodriguez-Tellez*, No. 2-07-0048 (2008) (unpublished order under Illinois Supreme Court Rule 23).

¶ 24 Thereafter, defendant filed a postconviction petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2008)), which the circuit court dismissed at the first stage of proceedings. He appealed the dismissal of his petition, and we reversed and remanded the matter for second-stage proceedings. *People v. Rodriguez-Tellez*, No. 2-09-1230 (2011) (unpublished order under Supreme Court Rule 23).

¶ 25 On remand, the circuit court dismissed defendant's petition at the second stage, and we again reversed on appeal, holding that postconviction counsel failed to substantially comply with Illinois Supreme Court Rule 651(c) (eff. Feb. 6, 2013). *People v. Rodriguez-Tellez*, 2018 IL App (2d) 160662-U, ¶ 26. We remanded to allow defendant to replead his claims with the assistance of new counsel. *Id.* ¶ 29.

¶ 26 Through new counsel, defendant filed a second amended postconviction petition, raising the issue of ineffective assistance of appellate counsel for failure to raise issues of jury indoctrination on direct appeal. The petition identified three questions the State asked potential jurors: the identification question, the credibility question, and the ABCD question. The petition

argued that the State asked these questions in anticipation of defendant's theory of the case, circling back to its *voir dire* examination in its arguments at trial.

¶ 27    The State moved to dismiss defendant's petition, and on September 20, 2019, the circuit court granted the motion and dismissed the petition. Defendant timely appealed.

¶ 28                                    II. ANALYSIS

¶ 29    At issue in this appeal is whether the circuit court erred in dismissing defendant's postconviction petition at the second stage. The Act provides a three-stage process for adjudicating postconviction petitions. *People v. Shipp*, 2015 IL App (2d) 131309, ¶ 6. If the circuit court does not dismiss the petition as "frivolous or *** patently without merit" at the first stage, the petition advances to the second stage, where the court may appoint counsel to an indigent defendant and the State enters the litigation as respondent. *People v. Tate*, 2012 IL 112214, ¶ 10. At the second stage, the circuit court must determine whether the petition and accompanying documentation has made a substantial showing of a constitutional violation, and if no showing is made, the petition is dismissed. *Id.* If the petition is not dismissed, it proceeds to an evidentiary hearing. *Shipp*, 2015 IL App (2d) 131309, ¶ 6. We review *de novo* the dismissal of a postconviction petition at the second stage. *People v. Johnson*, 2017 IL 120310, ¶ 14.

¶ 30    Defendant argues that he made a substantial showing that his appellate counsel was ineffective for failing to raise, either as plain error or ineffective assistance of trial counsel, the issue of the State's *voir dire* examination. He argues that the State's identification, credibility, and ABCD questions violated both his right to an impartial jury and Illinois Supreme Court Rule 431(a) (eff. July 1, 2012), which prohibits questions on matters of law or instructions. He argues that the three questions were improper both individually and cumulatively, and therefore it was unreasonable for his appellate counsel to not challenge each question on direct appeal.

¶ 31    Defendant argues that the identification question indoctrinated the jury in that it conditioned the jury to believe Ramirez's identification testimony, who testified that he was 90% sure that defendant was his carjacking assailant. Defendant argues that despite being only three or four feet from the assailant, Ramirez could not describe his facial features or see a cast on his arm, describing only a black jacket and a little closed hat. He argues that the State's case, which had no eyewitness to the murder, relied on Ramirez's identification of defendant.

¶ 32    Defendant continues that there is no reasonable likelihood that jurors will have fixed opinions or biases concerning identification evidence (*People v. Washington*, 104 Ill. App. 3d 386, 391 (1982)), and therefore questions concerning mistaken identity do not serve *voir dire*'s purpose of discovering a prospective juror's bias or prejudice. Rather, he argues that the State's identification question served to educate prospective jurors as to its theory of the case and helped the State select a jury receptive to its theory. Defendant concludes that asking this question at *voir dire* improperly allowed the State to preemptively rebut his mistaken identity defense and should have been raised by counsel on direct appeal.

¶ 33    Defendant next argues that the State asked the credibility question in anticipation that, on the witness stand, Adan would either recant her prior inculpatory statements about defendant or deny knowledge of them. Defendant notes that, at trial, Adan denied that defendant saw Medina place his hand on her and that she told police about that incident. Adan also testified that she could not remember telling the police to ask defendant who killed Medina, and she denied that defendant told her that he had done something "very bad."

¶ 34    Defendant argues that, through this question, the State was able to convey to the jury its belief that Adan would testify falsely to protect defendant, predisposing jurors to find her testimony incredible. He contends that this question also infringed on the jurors' role in

determining witness credibility, thus violating Rule 431(a) because the jury would be instructed on assessing witness credibility. In support, he cites *People v. Bell*, 152 Ill. App. 3d 1007 (1987), where the defendant was accused of murdering his parents and the court found reversible error based on the State's examination at *voir dire*.

¶ 35    Last, defendant argues that the ABCD question was intended to mislead the jury into disregarding relevant, exculpatory evidence. Directing us to the State's closing argument, defendant argues that the State labeled various facts in the case as "D"—from defendant telling Adan he knew only who killed Medina, not that he killed him, to the absence of DNA or fingerprint evidence. He argues that the State conflated the concept of an element of an offense with evidence of that element, improperly arguing that jurors should disregard relevant evidence by referencing back to its *voir dire* examination. In support, defendant cites *People v. M.D.*, 231 Ill. App. 3d 176 (1992), and *People v. Mapp*, 283 Ill. App. 3d 979 (1996). He argues that in *M.D.*, the court found it improper for the State to ask the venire whether it would automatically find reasonable doubt if it heard two conflicting versions of events, and that in *Mapp*, the court characterized the State's question to jurors as "preliminary final argument" when it asked whether they could find the defendant guilty of felony murder even if he did not shoot anyone. Defendant argues that the State's question here was likewise intended to shield itself from conflicting evidence and constituted preliminary final argument. He therefore concludes that appellate counsel should have challenged this question, as well as the other two, on direct appeal.

¶ 36    The State responds that it did not err in its examination at *voir dire*. As to the identification question, the State argues that the question was not tailored to the facts of the case and that its case did not rest on witness identification testimony. To wit, the State knew that Detective Dean Burton would testify that defendant confessed to Medina's murder, including how he committed the

offense and where he hid the murder weapon, and it had a videotape of defendant admitting to the murder. Burton would also testify that Adan told him during an interview that defendant told her he murdered Medina. The State argues that it also linked the shell casings from the murder scene to the weapon used at Ramirez's carjacking the week prior.

¶ 37    As to the credibility question, the State argues that *People v. Rinehart*, 2012 IL 111719, is instructive. It argues that there, our supreme court found that the State did not commit error in asking the venire about why a sexual assault victim might not automatically report an incident, reasoning that the question was less fact-driven and more focused on jurors' preconceptions about sexual assault cases. The State contends that like the question in *Rinehart*, its question to the venire was not fact-driven but instead was brief and focused on the venire's preconceptions about truthful testimony under oath.

¶ 38    Last, on its ABCD question, the State argues that there was nothing wrong with asking the venire whether they could set aside questions about other evidence if they found all elements of the crime beyond a reasonable doubt. It contends that all facts it labeled "D" were, in fact, "D" factors. Further, the State argues that it did not ask the venire whether they would disregard "D" in determining whether the State met its burden to prove all essential elements of the offense. Instead, the State argues that it asked jurors whether they could put aside their questions about "D" if they otherwise found the State proved all essential elements.

¶ 39    We reject defendant's argument that his appellate counsel was ineffective for failing to argue a violation of his right to an impartial jury or a violation of Rule 431(a), through either plain error or ineffective assistance of trial counsel. For a claim of ineffective assistance of appellate counsel, the defendant must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. English*, 2013 IL 112890, ¶ 33. The defendant must show both that

appellate counsel's performance was deficient and that but for counsel's errors, there was a reasonable probability that the appeal would have been successful. *Id.* A failure to establish either prong of the *Strickland* test precludes a finding of ineffectiveness. *People v. Peterson*, 2017 IL 120331, ¶ 79. Appellate counsel's performance is deficient when it falls below an objective standard of reasonableness. *People v. Stephens*, 2012 IL App (1st) 110296, ¶¶ 101, 109. Appellate counsel does not render deficient performance simply for failing to raise every conceivable issue on appeal; appellate counsel is not required to raise issues that they reasonably determine are not meritorious. *English*, 2013 IL 112890, ¶ 34. Ineffective assistance of trial counsel is determined under the same two-part *Strickland* standard as a claim of ineffective assistance of appellate counsel. *Stephens*, 2012 IL App (1st) 110296, ¶ 109.

¶ 40     For a plain error analysis, the first step is to determine whether a clear or obvious error occurred. *People v. Ramsey*, 239 Ill. 2d 342, 412 (2010). If we find that there was an unpreserved error, then defendant must demonstrate either (1) that the evidence was so closely balanced that the error alone threatened to tip the scales of justice against him, or (2) that the error was so serious that it affected the trial's fairness and challenged the integrity of the judicial process. *People v. Sebby*, 2017 IL 119445, ¶ 48.

¶ 41     Both defendant's ineffective assistance and plain error arguments turn on the propriety of the State's three questions. That is, if the State's challenged questions at *voir dire* were permissible, then there is no error for plain error and trial counsel did not act unreasonably in failing to object to the questions. Thus, we must determine whether the State's identification, credibility, and ABCD questions were proper. We first answer whether they were constitutional permissible and then whether they violated Rule 431(a).

¶ 42    The constitutional right to a jury trial encompasses the right to an impartial jury. *Rinehart*, 2012 IL 111719, ¶ 16. While the trial court is primarily responsible for conducting *voir dire*, it must permit the parties to supplement the examination. *Id.*; see Ill. S. Ct. R. 431 (eff. July 1, 2012). The manner and scope of *voir dire* rest within the trial court's discretion. *Rinehart*, 2012 IL 111719, ¶ 16.

¶ 43    The purpose of *voir dire* is the selection of a jury free from bias and prejudice. *Id.* Questions at *voir dire*, whether asked by the parties or the trial court, must not be used as a means of indoctrinating a jury or empaneling a jury with a particular disposition. *Id.* ¶ 17. There is no bright-line rule on whether questions improperly indoctrinate a jury. *Id.* Instead, we evaluate questions on a continuum, with broad questions being generally permissible and specific questions tailored to the facts of the case being generally impermissible. *Id.* For instance, the State may ask potential jurors about whether they would convict a defendant based on circumstantial evidence, but the State may not ask questions serving as "preliminary final argument." *Id.*

¶ 44    In *Rinehart*, the defendant was convicted of criminal sexual assault of a 17-year-old girl with developmental disabilities in that he forced her to have sex with him in the back of a minivan. *Id.* ¶¶ 1, 4. The victim told another girl about the assault several weeks later, and police subsequently arrested the defendant. *Id.* ¶ 4.

¶ 45    The supreme court considered whether the trial court erred in allowing the State to question 5 of 25 potential jurors about why a sexual assault victim might delay reporting an incident. *Id.* ¶ 2. The State asked potential jurors variations of the same question, including, "Can you think of some reasons why a sexual assault victim might not immediately report an incident?", "Can you think of a reason why a victim who had some things happen to them might not immediately go to an adult or report it?", and "Can you think of some reasons why a sexual assault victim might not

automatically come forward?" *Id.* ¶ 5. Two of the five potential jurors who were asked these questions were excused, one by the State and one by the defense. *Id.*

¶ 46    In analyzing whether the State's questions constituted error for purposes of plain error, the supreme court examined two cases where the State's *voir dire* examination improperly indoctrinated the jury. *Id.* ¶¶ 19-20. In *People v. Bell*, 152 Ill. App. 3d 1007, 1008 (1987), the defendant was convicted following a jury trial of the murder of his parents. During the investigation into the murders, the defendant eventually confessed to a police officer that he shot both his parents. *Id.* at 1009. On appeal, he claimed ineffective assistance of trial counsel, in part for failure to object to improper questioning at *voir dire*. *Id.* at 1017. The two challenged questions, which the State asked the majority of potential jurors, were: (1) whether they believed that people have a natural impulse to confess their wrongdoings, and (2) whether they believed a person could plan and carry out a murder of another person, even if that person were a family member, as a solution to problems within the relationship. *Id.* The appellate court agreed that these questions were improper because they served to indoctrinate the jurors as to the State's theory at trial and have them prejudge the facts.

¶ 47    In *People v. Boston*, 383 Ill. App. 3d 352, 352-53 (2008), the defendant was convicted by a jury of two counts of criminal sexual assault in that he committed acts of sexual penetration with his hand and penis on the victim's vagina, and on appeal he argued that he was denied his right to a fair trial because the State improperly indoctrinated jurors to its view of the case. The victim, K.B., had been in a "tumultuous, on-again, off-again" relationship with the defendant, and although she had obtained two orders of protections against him, she and the defendant would still regularly see each other and have consensual sex. The offenses took place after she returned from

a trip in November 2005, and she testified that he accused her of being with another man, became angry, called her names, and then committed the alleged offenses. *Id.*

¶ 48    The State asked a version of the following questions to all potential jurors:

> Is there anyone in the group that believes incidents that arise between two people who have a dating relationship should not be handled by the State? Is there anyone who believes if a person or a woman gets an order of protection against someone else and then invites that person over that she has the order against, does anyone believe that the invitation itself equals consent to a later sexual act? Is there anyone that believes the woman who invites the man over is responsible for anything violent that may happen after the person comes over? Is there anyone who believes that a person consents to a sexual act if they do not scream or fight or kick or yell or scratch or hit? *Id.* at 355.

The *Boston* court found these questions improper, explaining that they highlighted factual details about the case and asked prospective jurors to prejudge those facts. *Id.* It continued that the State's questions improperly concerned matters of law or instruction, in that the questions bore on the definition of "consent," which would have been given to the jury by a pattern instruction. *Id.* at 355-56. The court therefore reversed and remanded for a new trial, noting that the evidence in the case was close and that the State's questions may have resulted in a jury that was neither fair nor impartial. *Id.* at 356.

¶ 49    In *Rinehart*, the supreme court found that, in contrast to these cases, the questions before it were less fact-driven and more focused on jurors' preconceptions about sexual assault cases, which would allow the State to uncover any bias regarding delayed reporting and the credibility of a victim who did not immediately inform anyone about their assault. *Rinehart*, 2012 IL 111719, ¶ 21. The supreme court reasoned that the State's questions were brief, the State did not elaborate

on the subject, and it did not ask every juror about the subject. *Id.* Because there was no error, there was no plain error. *Id.* In addition, because there was no error, the defendant's trial counsel was not ineffective for failing to object to the State's questions at *voir dire*. *Id.* ¶ 22.

¶ 50     Here, the State's questions were not specific questions tailored to the facts of this case but instead were broad questions that fell on the permissible end of the continuum for *voir dire* queries. Beginning with the identification question, the State asked whether jurors believed that they could identify someone without being able to describe them. This was a general question, not one intertwined with the specific facts of defendant's case. The State occasionally followed up with a hypothetical example to illustrate what it meant by its question, but usually the question was brief, and the State moved on swiftly.

¶ 51     Relying on *Washington*, 104 Ill. App. 3d at 391, and *People v. Bowel*, 111 Ill. 2d 58 (1986), defendant argues that the identification question was improper because potential jurors do not have fixed opinions or biases concerning identification evidence and that questions concerning a mistaken identity defense do not help uncover juror bias. We find his authority unpersuasive. In both *Washington* and *Bowel*, the issue was whether the trial court abused its discretion *in refusing to ask* proposed questions about identification evidence. *Washington*, 104 Ill. App. 3d at 390-91; *Bowel*, 111 Ill. 2d at 64-65. The courts' rationales—that refusal was not error because there was no reasonable likelihood that jurors would have fixed opinions or biases about identification evidence or a mistaken identify defense (see *Washington*, 104 Ill. App. 3d at 391; *Bowel*, 111 Ill. 2d at 65)—do not support the conclusion that asking a general question touching on identification evidence necessarily indoctrinates a jury. A question does not have a constitutionally improper purpose simply because the question may be unlikely to uncover fixed opinions or bias. The State's identification question, uncoupled from the facts of the case, did not predispose jury members to

its theory of the case, nor did it ask them to prejudge the facts. In other words, asking jurors the identification question did not risk empaneling a jury predisposed to accept Ramirez's testimony that he was 90% sure that defendant carjacked him.

¶ 52 Next, the credibility question was likewise a permissible general question, and asking it did not risk empaneling a jury that was predisposed to discredit Adan's testimony. As with the identification question that asked whether it was *possible* to identify someone without describing them, the credibility question asked if the potential jurors believed it was *possible* to lie under oath. An answer in the affirmative did not inform the parties nor the trial court that a prospective juror harbored a bias that would interfere with a careful consideration of the specific evidence presented at trial. That is, a juror who believed it was possible for a hypothetical witness to lie under oath would not be predisposed to believe that a specific witness, such as Adan, was lying under oath. On the other hand, an answer in the negative would have revealed a bias, under the safe assumption that witnesses are capable of lying on the stand. Furthermore, the State's credibility questions were brief, and it asked the credibility question to only half of the empaneled jury members.

¶ 53 Defendant's reliance on *Bell* does not support his position. As discussed *supra* ¶ 46, the defendant in *Bell* was charged with the murder of his parents and eventually confessed to their murders. The State asked the venire not only whether they believed that people had a natural impulse to confess wrongdoing but also whether they believed a person could *plan and carry out a murder of another person*, even if that person were a *family member*. Unlike the credibility question here, these questions were tailored to the specific facts in *Bell*, and thus they helped select a jury predisposed to believe that the defendant killed his parents. As our supreme court stated in *Rinehart*, questions at *voir dire* fall on a continuum, and the questions in *Bell* were further on the specific, factually tailored end of the spectrum than the broader, hypothetical questions here.

¶ 54    Last, the ABCD question was a general question that boiled down to whether the jurors would follow the trial court's jury instructions on the elements necessary to convict. Defendant contends that this question's impropriety became evident during closing argument, when the State referenced "D" to characterize evidence as irrelevant to a guilty finding. We reject this argument because whether the State's closing argument was proper does not alone bear on whether the ABCD question was constitutionally permissible. We do not opine on whether the State's closing argument was proper, as the issue is not before us. However, even if we were to assume that the State's closing argument referencing "D" was improper, it would be improper because it misstated the law or subverted the trial court's role in instructing the jury on the elements of the offense, both of which would be independent of the propriety of the ABCD question at *voir dire*. In addition, we note that defense counsel asked several versions of an ABCD question to potential jurors, and it is uncontroversial to say that a potential juror who would decline to follow the law as instructed is ripe for excusal.

¶ 55    Defendant's case law does not aid his argument. In *Mapp*, 283 Ill. App. 3d at 980, 983, the defendant was convicted of murder and armed robbery, based on a theory of accountability. During jury selection, the State asked 15 of 33 potential jury members about accountability and felony murder, and 8 of those served on the jury. *Id.* at 983. The State asked if potential jurors would have a problem with the law of criminal responsibility, often in the specific context of convicting a defendant who was not the shooter. *Id.* at 983-86. The *Mapp* court concluded that the State could briefly summarize accountability principles and ask jurors if they could apply those principles. *Id.* at 989. Although the State went beyond permissible questions on accountability and effectively indoctrinated the jury—making "preliminary final argument" with its questions—the court found the error harmless, given the overwhelming evidence against the defendant. *Id.* 989-90. Thus, not

only did *Mapp* not reverse, but the State's tailored questions about convicting a defendant who did not shoot the victim on the basis of accountability were far more specific than the general ABCD questions here.

¶ 56    In *M.D.*, 231 Ill. App. 3d at 180, the defendant was convicted of aggravated criminal sexual assault against his wife. There, the State repeatedly advised prospective jurors that they would hear two versions of events and asked if this would create a reasonable doubt in their minds, sometimes specifically asking whether they could find the defendant guilty based on the victim's testimony alone. *Id.* at 197. Contrary to defendant's contention in his brief, the *M.D.* court did not actually conclude that these questions were error; it elided the issue and instead reasoned that any error would be harmless because the evidence against the defendant was overwhelming. *Id.* Again, the State's questions in *M.D.* are not comparable to the ABCD questions here, as those questions were tailored to ascertain whether jurors could believe one specific witness over another at trial.

¶ 57    Having determined that none of the State's questions were constitutionally impermissible, we conclude that appellate counsel was not ineffective for failing to raise plain error or ineffective assistance of trial counsel based on a violation of defendant's right to an impartial jury. We now examine whether any of these questions violated Rule 431(a).

¶ 58    The State's credibility and ABCD questions arguably concerned matters of law or instruction. The ABCD question was a general inquiry into whether the jury would follow the trial court's instructions on the elements necessary to convict defendant, although that question may also be viewed as akin to the trial court's duty to "acquaint prospective jurors with the general duties and responsibilities of jurors." See Ill. S. Ct. R. 431(a) (eff. July 1, 2012). As to the credibility question, the trial court instructed the jury on matters of witness credibility in general (Illinois Pattern Jury Instructions, Criminal, No. 1.02) and the credibility of witness testimony in

light of a prior inconsistent statement (Illinois Pattern Jury Instructions, Criminal, No. 3.11), and thus the State's credibility question related to a matter of instruction, in particular with respect to Adan's testimony.

¶ 59     However, any error here would not rise to the level of plain error. First, the evidence was not closely balanced. Although defendant focuses on Adan's and Ramirez's testimony, the fact of the matter is that defendant confessed to Medina's murder to the police and to his brother. The State had both defendant's brother, Valente, and Detective Burton testify at trial. Burton's interview with defendant, in which he confessed to shooting Medina, was videotaped.

¶ 60     In addition, any error under Rule 431(a) was not so serious as to affect the fundamental fairness of defendant's trial. Our supreme court has held that we will not automatically reverse for a violation of Rule 431(b). *People v. Thompson*, 238 Ill. 2d 598, 616 (2010). It explained that a violation of Rule 431(b) was not a structural error, which are errors that erode the integrity of the judicial process and undermine a trial's fairness. *Id.* at 608-10. We see no reason to treat differently a violation of the portion of Rule 431(a) prohibiting questions concerning matters of law or instruction. Moreover, we have already determined that these questions did not violate defendant's constitutional right to an impartial jury. Rule 431 governs *voir dire* examination, whose purpose is the selection of a jury free from bias and prejudice. *Rinehart*, 2012 IL 111719, ¶ 16. Accordingly, any violation here of Rule 431(a) based on questions that did not result in an impartial jury was not a serious error affecting the fairness of defendant's trial.

¶ 61                                III. CONCLUSION

¶ 62     For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 63     Affirmed.