NOTICE

Decision filed 01/20/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 210290-U

NO. 5-21-0290

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 19-CF-3008 |
| | ) | |
| ARRON M. DEWERFF, | ) | Honorable |
| | ) | Martin J. Mengarelli, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Justices Cates and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We reverse the defendant's conviction and sentence for unlawful possession of weapons by a felon, and remand for a new trial, because the defendant is correct that in this case in which the evidence was closely balanced, and mostly circumstantial, the trial judge abused his discretion when he allowed the State to improperly indoctrinate the entire jury pool during *voir dire* by presenting extended narrative hypothetical "examples," and follow-up questioning, related to the legal concepts of circumstantial evidence and possession versus ownership.

¶ 2    The defendant, Arron M. Dewerff, appeals his conviction and sentence, following a trial by jury in the circuit court of Madison County, for one count of unlawful possession of weapons by a felon. For the following reasons, we reverse the defendant's conviction and sentence, and remand for a new trial.

1

¶ 3                              I. BACKGROUND

¶ 4      Although the defendant raises multiple issues on appeal, in the interest of judicial economy we provide detailed facts about only the issue that we find to be dispositive. Additional facts are provided as necessary for context. On September 12, 2019, the defendant was charged, by amended information, with one count of unlawful possession of weapons by a felon, a Class 2 felony. The amended information alleged that on September 11, 2019, the defendant, who had a prior felony conviction in 2003 for aggravated domestic battery, "knowingly possessed on his land or in his own abode numerous boxes of .17 caliber, .22 caliber, .380 caliber, and 9 mm ammunition" in contravention of the law. Thereafter, the defendant was indicted by a grand jury for the same offense.

¶ 5      On May 20, 2021, motions *in limine* were filed by both the State and the defendant. The defendant's two motions requested, *inter alia*, that the trial judge prevent the State from mentioning at trial any prior crimes of the defendant, or any prior contacts with police, unless permissible by law. On May 26, 2021, the State filed an additional motion *in limine* related to the question of other-crimes and bad-acts evidence—including contacts with the police—that it wished to introduce at the defendant's trial. A hearing on the motions was held on May 26, 2021. The defendant first moved for a continuance of his upcoming trial, contending that he had received voluminous new discovery from the State just days before the present hearing. After that issue was resolved, the defendant asked the trial judge "to bar any evidence that has not been previously tendered to us and *** we're still a week out, so I don't know if we're going to get anything in new." Upon questioning by the trial judge, the State answered that it did not "anticipate anything right now." Thereafter, in support of its motions *in limine*, the State asked the trial judge to bar any witnesses that were not disclosed by the defendant to the State. Defense counsel responded, "Well, we're entitled to present rebuttal witnesses without advance notice. I think I have listed everybody,

Judge. I'm trying to list everybody." The trial judge replied, "I'll reserve ruling until that issue comes up."

¶ 6    The defendant's jury trial began approximately two weeks later, on June 8, 2021. The trial judge indicated that a group of 30 potential jurors would be questioned together at the outset of *voir dire*, with additional jurors to be questioned later if necessary. Thereafter, the trial judge informed the first group of 30 potential jurors that, *inter alia*, this case was his first criminal jury trial as a judge. He then conducted extensive *voir dire* questioning of the group, mostly with regard to the answers provided by the potential jurors on their juror questionnaires.

¶ 7    During its *voir dire* of these 30 potential jurors, lead counsel for the State asked the potential jurors if anyone had "strong feelings" about the second amendment, in light of the charge against the defendant, and she asked short follow-up questions of the multiple potential jurors who had indicated that they did. Her questioning of the potential jurors with regard to this issue comprises approximately 10.5 pages in the report of proceedings that was filed as part of the record on appeal. After she finished her questioning about this issue, she turned the questioning over to her co-counsel, who introduced himself and proceeded as follows:

"As the Judge instructed you all, this is a case of unlawful possession of a weapon. And there's going to be some stuff that comes up today that I think whenever I understand these concepts it's better to have an example kind of to illustrate it.

So the first example I'm going to give you kinda goes towards what we refer to as circumstantial evidence. So if you can imagine that someone—you have this house, that there is a mom or a dad, and they have a plate full of cookies, for example, sitting on the table and they also have a child in the home, a young toddler. They're doing something in the kitchen or their attention's divided. They're not fully aware of what's going on behind them, and the next thing they know, they look over and the plate of cookies is gone. They

3

look closer, and they see some crumbs on the table. They maybe see some chocolate smeared somewhere along the house and then they go into the living room and they see a young child who has some crumbs on his hands. So in that particular situation, no one ever saw the young kid eat the cookies, right? No one ever saw the kid with the cookies in his hand. Is there anyone in this room that would have a problem with connecting all of those pieces and saying the kid was the one that ate the cookies?"

In the report of proceedings, the court reporter indicates that there was no response to this question. Counsel continued as follows: "Does everyone understand that that's what we call circumstantial evidence? That you don't need to have somebody with something in their hands, that as long as you can connect the dots—." At this point, defense counsel interrupted, stating, "I'm going to object at this point. This is indoctrination, not questioning. It's improper *voir dire*." The trial judge stated simply, without conducting a sidebar or asking for elaboration or explanation from either party, "I'm going to overrule the objection. You may continue."

¶ 8    Counsel for the State then asked the potential jurors if they had "any thoughts" about the example he had presented. One potential juror stated, "I would think that there could be a dog in there. That would be my first thing." Counsel responded, "Okay, fair enough. Let's say that there is no dog. Let's assume that it's just the parents and the child. Do you have any questions about who could possibly have done it?" The potential juror thereafter answered that she did not. Counsel continued: "Okay. Does anybody else have any thoughts as we are talking about that example? How about you, ma'am?" The potential juror to whom counsel addressed this question answered, "No." Counsel replied, "No questions?" The potential juror again answered, "No." Counsel again continued: "Okay. Anyone else have any thoughts?" The report of proceedings indicates that there was no response to this question. Counsel proceeded as follows:

4

"So that's what we call, as I said, circumstantial evidence. Another issue that I think that we're going to see a lot of in this case is going to be an issue of possession versus ownership. When I think of this situation, I like to think about a teenager getting his first car. So can you raise your hand by a show of hands, does anybody know a 16 year old who got a car for their birthday?"

The report of proceedings indicates that the potential jurors "responded." Counsel continued: "A lot of you guys, good. How many thought—of all of you who raised their hands, how many of you in that situation—how many of the 16 year olds actually bought the car for themselves?" The report of proceedings again indicates that the potential jurors "responded," and counsel then asked a specific juror if he "did," to which the juror responded, "Yeah." Counsel then stated the following:

"Okay. But in most situations, like I said, it's the parents that buy the car for the kid, right? So in that situation, you could have a parent who was the owner and, like I said, the car was given to the kid as a gift. Is there anybody who has an issue with distinguishing the person who bought the car, who owns the car, versus the person who uses the car to go to school, to go to sports, classes, whatever and having possession? Anybody?"

¶ 9    The report of proceedings indicates that there was no response to these questions. Counsel added, "Is there anyone who has an issue of saying that the kid possesses the car even though he didn't buy it?" Again there was no response. Counsel concluded his questioning, which, as described above, consisted of an approximately 200-word "example" of circumstantial evidence, followed by multiple questions about that example, and a somewhat shorter "example" regarding ownership and possession, also followed by multiple questions about that example, all of which comprise a total of approximately four pages in the report of proceedings.

5

¶ 10    Following a sidebar, lead counsel for the State asked the potential jurors about their religious beliefs and their ability to sit as jurors in judgment of another person, and about watching true crime shows and how that might impact their expectations for the trial. No jurors responded to any of her questions, which comprise approximately two pages in the report of proceedings. Defense counsel conducted his questioning, then a jury selection conference was held outside the presence of the potential jurors. The full jury for the defendant's trial, including two alternate jurors, was selected from the first group of 30 potential jurors, so no second group of potential jurors was questioned in this case.

¶ 11    During its opening statement, the State indicated that, *inter alia*, it expected to present testimony from Brandi Talley (the defendant's former girlfriend) that the defendant kept firearms and ammunition in the home they shared when they were together, as well as from two of Brandi's daughters (S.H. and A.H.) that they too saw the defendant possess and use firearms and ammunition on multiple occasions. Immediately after opening statements, the State was permitted to call its first witness.

¶ 12    Timothy Lawrence testified that he was a detective with the Madison County Sheriff's Department. He testified that on September 11, 2019, he was part of a team of law enforcement officers who executed a search warrant at a property owned by the defendant in rural Madison County. He testified that no one other than the officers was present at the property when the search was conducted, and that during the search of one of the homes on the property, officers found "manuals for different types of firearms," as well as "over 2700 rounds of ammunition." Lawrence authenticated various photographs of the house and items seized, and authenticated the items themselves, which were admitted into evidence and presented to the jury. He testified that .22-caliber rounds of ammunition were seized, as were 9-millimeter, .380-caliber, and .17-caliber rounds. He testified that the officers also found targets, a sight/scope, ammunition magazines, and

6

firearm boxes, but no actual firearms. On cross-examination, Lawrence agreed that Brandi had a valid FOID card at the time of the search, and that he was not able to ask her if she owned the ammunition that was seized, because she would not speak with him. He further agreed that both male and female belongings were found in the room where the ammunition and other materials were found, and that he did not know the last time, prior to the search, that the defendant had been at the property.

¶ 13    Kristopher Tharp testified that he was an officer with the Madison County Sheriff's Department, currently serving as a captain, and that he was one of the officers who executed the search warrant at the defendant's property on September 11, 2019. He testified consistently with Detective Lawrence as to what was discovered during the search, and also testified about items found in the bathroom of the house, which he described as "male" toiletries and other "male" items. On cross-examination, he agreed that some of the "male" items could have been used by a female, and that tampons were found near the items as well. He subsequently agreed that some of the ammunition that was found during the search would have fit a firearm that belonged to Brandi according to a firearms transfer document that he was shown by defense counsel.

¶ 14    On the morning of the second day of the defendant's trial, prior to the commencement of testimony and outside the presence of the jury, various matters were taken up. Of relevance to this appeal, defense counsel noted that the previous day, "[t]he State in their opening statements indicated that some of the witnesses that they intend to call today will state that my client has engaged in the discharge of firearms at some time in the past." Counsel contended that after reviewing all of the discovery provided to him by the State, "regarding all the witnesses they're speaking of," there existed "no mention of my client discharging a weapon." He added:

    "I also believe that this is another form of them trying to prove the commission of another

    crime to sway the jury to believe that he would act accordingly in the instant cause due to

7

his propensity to engage in this type of behavior, which I believe is barred by [Illinois Rule of Evidence] 404. Rule 404 requires the State to provide advanced notice to the defense of any type of information like this. That sounds to me like they have statements that they may have taken or obtained from these witnesses that I don't have. And I think it's improper for them to be allowed to proceed with introduction of any of that type of evidence for those reasons."

¶ 15 The State responded as follows:

"[T]his evidence would not be used to show that the defendant acted in conformity with, it would simply be used to show that he had motive and intent to possess this ammunition. There's no sense in having ammunition if you don't have a firearm to use it. And if, in fact, you have used a firearm that would be evidence that you had had ammunition in your possession and control at some point. Additionally, with regard to statements of the witnesses, he has known the names of these witnesses for months and months and months, he's freely able to contact them, the reports do not reflect every single thing that every witness said. In fact, some of this information is new, we just learned about the specifics ourselves."

The trial judge, without additional comment, stated, "I'm going to deny the motion." The jury was then brought into the courtroom and testimony resumed.

¶ 16 Brandi Talley testified that she dated the defendant for three years, and lived with him at the defendant's property in Madison County from 2017 to 2019. She testified that during that time, she knew the defendant kept firearms on the property, "[m]ainly in the bedroom," but also in "a gun safe in the garage outside." She testified that she was not able to access the gun safe. She testified that she saw the defendant handle "[l]ong rifles," as well as "little small pistols." She testified that she also saw "[s]everal boxes" of ammunition in the home. She testified that she did

8

not like guns, because she had always been "scared of them." Brandi testified about various furnishings and objects in the home that she claimed belonged to the defendant. She testified that all of the items seized by the police belonged to the defendant, not to her. She testified that she had seen the defendant shoot at targets on the property.

¶ 17    When asked about her previous romantic relationship with the defendant, Brandi testified that she felt "pressured" and "controlled" by the defendant while they were together, and that he made her sign papers for him. She testified that she was afraid of the defendant. She testified that when she eventually left the defendant and returned to her parents' home in Louisiana, she took a long rifle and some pistols with her, because the firearms were registered in her name. She testified that thereafter she returned to Illinois with the defendant, and that they brought the firearms back to Illinois in the defendant's vehicle. She testified that on September 11, 2019, she and the defendant were living together at the home on the defendant's property. Brandi testified that they were having dinner together at a restaurant in Wood River when they were notified by the Madison County Sheriff's Department that a search warrant was to be executed at their home. She testified that she left the defendant "for good" in October of 2019.

¶ 18    On cross-examination, Brandi denied that she obtained an Illinois FOID card, testifying that the defendant obtained one in her name. She conceded that her name and personal information were on the card, but insisted that the defendant applied for the card without her consent. She agreed that she did not return the card or report to anyone that the defendant had forced her to get it. She testified that she had never fired a gun in her life, and never purchased one. When shown firearm transfer documents that indicated that she had purchased firearms, she testified that the defendant was also present when those documents were executed, and that the firearms were purchased in her name for the defendant. She agreed that all of the ammunition seized in this case was compatible with the types of firearms that were purchased in her name. She testified that the

defendant "stole" her FOID card to make the purchases, and paid for them with his own credit card. She agreed that she was not on good terms with the defendant, but denied that she was "mad" at him about anything. On redirect examination, Brandi testified that she learned during the course of her relationship with the defendant that he was not allowed to own or possess firearms or ammunition because he was a convicted felon, and that the reason he wanted her to get a FOID card was so that he could use it to purchase firearms and ammunition. She testified that she never had a FOID card prior to meeting the defendant, and never had an interest in guns before that time either.

¶ 19    Kevin Talley testified that he was Brandi's father, and that he lived in Louisiana. He testified that in May of 2019, the defendant visited Louisiana, and that he and the defendant "went coon hunting." He testified that the defendant possessed a handgun while they hunted. Defense counsel objected to Kevin's testimony about the defendant possessing a firearm. Kevin testified that he did not know where the defendant got the handgun, and that the defendant did not fire the gun while they were hunting. He testified that he observed firearms that did not belong to him at his home after Brandi first left the defendant, and that after the defendant picked Brandi up to take her back to Illinois, the firearms were gone. He testified that when Brandi was growing up, although she would "tag along" when Kevin and his son went hunting, Brandi would not carry or shoot a gun. Kevin further testified that throughout her life, Brandi would observe Kevin and Kevin's son with various firearms, but that she would not handle or shoot them.

¶ 20    S.H. testified that she was Brandi's daughter, was 14 years old, and that she previously lived with her mother and the defendant at the home on the defendant's property in Illinois. She testified that when helping her mother clean at the home, she saw "bullets" in a dresser in the home, as well as "[a] rifle and pistol" under the bed in the bedroom her mother shared with the defendant. She testified that she observed the defendant shooting a firearm at a target outdoors

while she lived at the home. She testified that she never saw her mother handle a firearm or ammunition. She testified that when she and her mother and her sister were returning to Illinois with the defendant from Louisiana, she saw guns in the back seat of the car. She testified that she knew that the defendant was not supposed to be around guns.

¶ 21    A.H. testified that she was Brandi's daughter, was 11 years old, and that she previously lived with her mother and the defendant at the home on the defendant's property in Illinois. A.H. testified that while she lived at the home, she saw "[a] long gun and like some short handguns" at the home. She testified that the guns were black, and that "[t]he long one was under the bed and the small ones were like under the dresser." She clarified that the bed she was referring to was the bed in the bedroom her mother shared with the defendant. She testified that she did not ever see any ammunition at the house while she lived there. A.H. testified that when she and her mother and her sister were returning to Illinois with the defendant from Louisiana, she saw guns in the back seat of the car. She testified that "[t]here was one in the back, it was like covered with a blanket, and there was like a case on the—under the seat." She testified that the defendant covered one of the guns with the blanket because he was not allowed to be around guns.

¶ 22    Following A.H.'s testimony, and outside the presence of the jury, the State objected to a list of rebuttal witnesses that had just been tendered to it by the defense. Defense counsel contended that he was calling the witnesses to rebut, in part, what the State's witnesses testified to with regard to the defendant's possession and/or use of weapons on other occasions, which he was unaware of until the State's opening statement, at which time he had asked that the State's evidence be barred. After the trial judge ruled that no one who was not on the defendant's initial witness list would be allowed to testify, defense counsel stated the following:

> "And Judge, so we're clear for the record, the girls that testified today, we haven't had any
>
> contact with them, haven't been able to contact them because Brandi would not call us

back. She's the parent, they refused to respond to my inquiries to see what they are going to testify about, and we had zero discovery given to us before we heard it coming out of their mouths at trial. We don't have any discovery of what they are going to say, that's why I just listed a rebuttal witness late because we, for the first time, heard what they were going to say."

¶ 23    When testimony resumed, Jacob Svoboda testified that he was a deputy sheriff with the Madison County Sheriff's Department. He testified that on September 6, 2019, he was dispatched to a call of a horse in the roadway at the defendant's property. He testified that he made contact with the defendant at the property. He identified the defendant in court. Svoboda testified that he observed the defendant come out of the house that day, and that the defendant told Svoboda that the defendant had been sleeping and had not heard officers knocking on the door to the home. He testified that Brandi Talley was also present on the property that day. On cross-examination, Svoboda agreed that he had not noted in his police report that the defendant emerged from the home, or that the defendant stated that he had been sleeping.

¶ 24    Jeffrey Dewerff testified for the defendant. He testified that he was the defendant's brother, and that from approximately July of 2019 to January of 2020, the defendant was not living at the property where the ammunition was found. He testified that during that time, Jeffrey took care of errands and upkeep of the property for the defendant. On cross-examination, Jeffrey agreed that he did not know where the defendant was on the exact date of September 11, 2019.

¶ 25    Eric Dewerff testified that he was the defendant's brother, and that from approximately July of 2019 to January of 2020, the defendant was not living at the property where the ammunition was found. He too testified that during that time, he took care of errands and upkeep of the property for the defendant. He estimated that he visited the property approximately once a week during that time. He testified that he did not observe the defendant possessing firearms or ammunition in

September of 2019. On cross-examination, he agreed that ammunition could have been stored on the property without his knowledge, and agreed that he did not know where the defendant was on September 11, 2019.

¶ 26   Katrina Gibbs testified that she was the defendant's aunt, and that from approximately July of 2019 to January of 2020, the defendant was not living at the property where the ammunition was found. Like the defendant's two brothers, she testified that during that time, she took care of errands and upkeep of the property for the defendant. She testified that she believed that Brandi continued to live at the property until approximately Thanksgiving of 2019. She testified that she never saw the defendant possess ammunition or "hold or shoot a gun." On cross-examination, she agreed that she did not know where the defendant was on September 11, 2019, or if he possessed ammunition on that date.

¶ 27   The defendant testified that from July of 2019 to January of 2020, he was not living at the property where the ammunition was found. He testified that he was not on the property on September 11, 2019, and that any ammunition found there on that date belonged to Brandi, not to him. He testified that he was last living on the property on July 2, 2019. He testified that no firearms were ever stored in the home when he lived there. He testified that Brandi owned firearms and would shoot them at targets in the back yard of the home. He testified that she had access to the gun safe in the outside garage, and that he did not ever have access to it, because he did not have a key to it. The defendant testified that he never touched any of the ammunition that was found on the property during the search, and that his fingerprints would not be on any of the boxes of ammunition. He testified that although he went coon hunting with Brandi's father and brother, he did not possess a firearm or ammunition, because only one firearm was needed for the hunting and Brandi's brother carried it. He testified that it was Brandi who placed firearms in their vehicle for the trip to Illinois from Louisiana, and that he did not want her to do so. He testified that he was

13

not present with Brandi when she purchased firearms using her FOID card, that he did not apply for the FOID card for her, and that he did not use her name or FOID card to purchase any of the firearms or ammunition mentioned at his trial. The defendant further testified that he never fired a gun at his property in Madison County. He agreed that his relationship with S.H. was "strained," because S.H. did not want to live in Illinois. He testified that he had a good relationship with A.H. On cross-examination, the defendant testified that none of the ammunition that was found during the search was present in the home when he lived there. He agreed that many of his possessions were in the home on September 11, 2019, and were near where the ammunition was found.

¶ 28    Following the defendant's testimony, the trial was adjourned for the day. The following morning, closing arguments were given,[1] and the jury retired to deliberate at 10:12 a.m. At 11:18 a.m., the jury sent the judge a note which asked the following questions: (1) "can we get a copy or see the Illinois state statute the defendant is being charged with or can you please clarify what the defendant is being charged with," (2) "is it legal to live around/be around guns and ammunition while being a felon in Illinois," and (3) "can a felon live/be around guns & ammunition in the home where someone has a legal FOID card and registered firearm? Would that also be considered possession?" The parties and the trial judge agreed that the appropriate response to the questions was to tell the jury that "[t]he law that applies to this case is contained within the instructions which you have received."

¶ 29    At 2:38 p.m., the jury sent the judge a second note, which stated as follows: "If we are at a standstill and we are 11 to 1 on making a decision what are the next steps to take or do we deliberate until an [sic] unanimous decision?" The parties and the trial judge agreed that the appropriate response was to ask the jury to continue to deliberate until it reached a unanimous decision. At

---

[1]For the reasons explained below, we need not discuss closing arguments in detail.

5:13 p.m., the jury returned a verdict finding the defendant guilty of the charge against him. The defendant subsequently filed a motion for a new trial, which was denied at the outset of the defendant's September 1, 2021, sentencing hearing. Thereafter, the defendant, upon joint recommendation of the parties, was sentenced to three years in prison, at 50% and with credit for time served, to be followed by a two-year term of mandatory supervised release.[2] This timely appeal followed. Additional facts will be provided as necessary below.

¶ 30                                   II. ANALYSIS

¶ 31    On appeal, the defendant contends, *inter alia*, that he was denied a fair trial because "the State improperly indoctrinated the jury pool with legal arguments during *voir dire*." His specific contention is that the State's use of extended "examples" involving circumstantial evidence (via its disappearing cookies example), and involving possession versus ownership (via its child being given a car example) (1) "directly concerned matters of law, specifically addressed by the jury instructions," (2) were not posed for proper *voir dire* purposes such as to uncover biases, and (3) instead were posed as "thinly veiled analogies" to the facts of this case in an effort to indoctrinate the potential jurors to the State's theory of the case and to serve as an impermissible "preliminary final argument" delivered during *voir dire*. He posits that the State's purpose "was advancing contested legal theories, inextricably tied to the question of guilt that the jurors would later be asked to decide." He further posits that "[b]y training the unsworn jurors to distinguish between 'ownership' and 'possession,' and then repeatedly reminding them that 'ownership does not matter,' the State had effectively managed to inoculate the jury's minds against the defense's entire theory of the case, before it had heard a single shred of its evidence." We find the defendant's

---

[2]Public records from the Illinois Department of Corrections, of which this court may take judicial notice (see, *e.g.*, *People v. Sanchez*, 404 Ill. App. 3d 15, 17 (2010)), indicate that the defendant completed his required term of incarceration on April 8, 2022, at which time he began his mandatory supervised release term, which is slated to end on April 9, 2024.

contentions to be correct, and dispositive of this appeal. For that reason, we begin our analysis with this claim of error, and address his other claims of error to the limited extent that is necessary below.

¶ 32    As the Illinois Supreme Court has held, "[t]he constitutional right to a jury trial encompasses the right to an impartial jury." *People v. Rinehart*, 2012 IL 111719, ¶ 16. Although the judge presiding over a jury trial "is primarily responsible for initiating and conducting *voir dire*," the parties are permitted by Illinois Supreme Court Rule 431 (eff. July 1, 2012) to supplement the trial judge's questioning. *Id.* Because there exists no precise test to determine which questions from a judge or party "will filter out partial jurors," or those with biases, the manner and scope of *voir dire* examination lies within the discretion of the trial judge, and reviewing courts examine decisions about *voir dire* questioning for an abuse of the trial judge's discretion. *Id.* A reviewing court will find an abuse of discretion if the trial judge's decisions about *voir dire* examination thwart the purpose of *voir dire*, which is "the selection of a jury free from bias or prejudice." *Id.*

¶ 33    In light of the purpose of *voir dire*, questioning—whether by the trial judge or by the parties—may not become " 'a means of indoctrinating a jury, or impaneling a jury with a particular predisposition.' " *Id.* ¶ 17 (quoting *People v. Bowel*, 111 Ill. 2d 58, 64 (1986)). The Illinois Supreme Court has declined to create a bright-line rule as to indoctrination, stating instead that this issue involves "a continuum." *Id.* Whereas "[b]road questions are generally permissible," such as questions about whether potential jurors "would be disinclined to convict a defendant based on circumstantial evidence," more "[s]pecific questions tailored to the facts of the case and intended to serve as 'preliminary final argument' " are usually not permissible. *Id.* (quoting *People v. Mapp*, 283 Ill. App. 3d 979, 989-90 (1996)). In *Rinehart*, the Illinois Supreme Court ultimately found the questions at issue in that case were permissible because (1) their purpose was "to uncover any

16

bias," (2) they "were brief, *** the State did not elaborate on the subject, [and] instead accepted the answers it received," and (3) the questions were not asked of the entire panel of potential jurors, but instead were asked of only "one-fifth of the venire." *Id.* ¶ 21. The court suggested that the questions at issue "could have been raised more artfully *** and perhaps phrased in terms of a venire member's bias and ability to put any bias aside in reaching a verdict," but nevertheless declined to find an abuse of discretion on the part of the trial judge for allowing the questioning to occur. *Id.*

¶ 34    As the Illinois Supreme Court acknowledged in *Rinehart* (see *id.* ¶¶ 18-21), panels of the Illinois Appellate Court have found *voir dire* questions to be improper where the questions "served primarily to indoctrinate the jurors as to the State's theory at trial and asked them to prejudge the facts of the case" (see *People v. Bell*, 152 Ill. App. 3d 1007, 1017 (1987)), and where the questions "highlighted factual details about the case and asked prospective jurors to prejudge those facts" or where they concerned matters of law or jury instruction, which are not permissible areas of inquiry during *voir dire*. See *People v. Boston*, 383 Ill. App. 3d 352, 355 (2008); see also Ill. S. Ct. R. 431(a) (eff. July 1, 2012) ("Questions [asked during *voir dire*] shall not directly or indirectly concern matters of law or instructions."). The *Boston* court concluded that because the evidence was close in that case, and because "[t]he State's improper questions were asked of all prospective jurors and may have resulted in the selection of a jury that was neither fair nor impartial," reversible error had occurred, which led the *Boston* court to reverse the defendant's convictions and sentences and remand the cause to the circuit court for a new trial. 383 Ill. App. 3d at 356. The Illinois Supreme Court also has noted that when deciding whether a particular line of *voir dire* questioning is acceptable in a particular case, that questioning "must be considered in the context of the charges" faced by the defendant. *Encalado*, 2018 IL 122059, ¶ 34.

¶ 35    In this case, at trial the State did not offer any explanation for why it was engaging in extended hypothetical "examples" related to circumstantial evidence and possession versus ownership, rather than in the concise, direct questioning as to biases that *voir dire* exists to accomplish. On appeal, the State posits that the *voir dire* conducted by counsel for the State at trial with regard to circumstantial evidence was permissible because "discussion of circumstantial evidence was not meant to indoctrinate the prospective jurors but rather uncover any inability to distinguish the differences between direct and circumstantial evidence." However, as explained above, the proper purpose of *voir dire* is to expose biases (see, *e.g.*, *Rinehart*, 2012 IL 111719, ¶ 16), not to perform a self-created, protracted I.Q. test on potential jurors to ensure they can comprehend concepts such as circumstantial evidence, and can distinguish between possession and ownership. Moreover, as the defendant correctly asserts, it was the duty of the trial judge, not the State, to instruct the jurors as to these concepts as matters of law, and as we have noted above, the courts of this state have repeatedly held that *voir dire* questioning by the parties may not involve matters of law or jury instruction. See, *e.g.*, *Boston*, 383 Ill. App. 3d at 355. Indeed, also as noted above, Illinois Supreme Court Rule 431 (eff. July 1, 2012) strictly prohibits this practice, stating that "[q]uestions [asked during *voir dire*] shall not directly or indirectly concern matters of law or instructions."

¶ 36    The State also claims on appeal that notwithstanding the State's approximately 200-word disappearing cookie narrative "example" that prefaced its questioning about circumstantial evidence, the State's *voir dire* nevertheless was akin to permissible "broad questions" to see if jurors were biased against the use of circumstantial evidence to convict a defendant. We do not agree. To the contrary, we agree with the defendant that although courts have allowed "[b]road questions" such as questions about whether potential jurors "would be disinclined to convict a defendant based on circumstantial evidence" (*Rinehart*, 2012 IL 111719, ¶ 17), no court in this

18

state, to our knowledge, has ever allowed counsel to preface such questioning with extensive narrative examples of the kind that were introduced by the State in this case. Moreover, it is clear from the State's narrative and the questioning that followed it—quoted extensively above—that the State was focused on introducing fact patterns that were analogous enough to the facts of this case to ensure potential jurors were introduced to guilt by circumstantial evidence, and guilt by possession, regardless of ownership—both of which were crucial to the State's theory of guilt in this case. There is no reasonable way to conclude that the State's focus was on whether the potential jurors had biases that would prevent them from following the law as to these concepts. In fact, the State never asked the potential jurors if they would be unable to convict the defendant based upon circumstantial evidence, and never asked the potential jurors if they would be unable to convict the defendant if he possessed ammunition, regardless of whether he technically owned the ammunition. Thus, it is clear that the questioning was not conducted in pursuit of a legitimate purpose of *voir dire*, and was instead intended to indoctrinate the jurors as to the State's theory of guilt, and to present an impermissible " 'preliminary final argument' " (*id.* (quoting *Mapp*, 283 Ill. App. 3d at 989-90)) to begin to condition the jury to accept the State's theory and convict the defendant.

¶ 37    We further note that the State offers no substantive argument in defense of its *voir dire* regarding possession versus ownership, claiming instead only that the defendant has forfeited his claim related thereto because he did not pose a second objection after his first one was overruled. However, we agree with the defendant that his first objection at trial was sufficient to preserve both instances of claimed error related to improper juror indoctrination, because the second instance immediately followed the first instance and clearly constituted a continuation of the State's improper *voir dire*, rendering a second objection unnecessary (as well as pointless, in light

19

of the summary manner in which the trial judge rejected his first objection), and because the defendant's posttrial motion adequately referenced the claim of error as well.

¶ 38    Moreover, we conclude that the State's improper *voir dire* in this case devolved into reversible error, because allowing it to take place thwarted the proper purpose of *voir dire* and accordingly constituted an abuse of the trial judge's discretion. *Id.* ¶ 16. As explained above, the State's improper *voir dire* comprises approximately four pages in the report of proceedings. The State's entire *voir dire* comprises just over 16 pages, which means that the improper portion was almost one-fourth—or 25%—of the State's total *voir dire*. Clearly, the improper narrative and questioning did not constitute a small or negligible portion of the State's *voir dire*, and instead was integral to that *voir dire*. In addition, we find reversible error, as did the court in *Boston* (see 383 Ill. App. 3d at 356), because the evidence was close in this case, and because "[t]he State's improper questions were asked of all prospective jurors and may have resulted in the selection of a jury that was neither fair nor impartial."

¶ 39    With regard to the closeness of the evidence in this case, we note that virtually all of the State's evidence that the defendant possessed the ammunition in question on September 11, 2019, was circumstantial, with the only arguably "direct" evidence coming from the testimony of his ex-girlfriend, Brandi. Accordingly, this case essentially came down to a credibility contest between two witnesses who were once in an intimate relationship with each other, but no longer were at the time of the trial. No physical evidence connecting the defendant to the ammunition was produced at trial. Moreover, the notes sent by the jury to the trial judge during the jury's approximately seven hours of deliberation in this case—which we reiterate involved a single count of unlawful possession of ammunition by a felon—lead to the reasonable inference that the jurors struggled with whether the defendant possessed the ammunition, and that they had difficulty reaching a unanimous determination that he did. In addition, as explained above, only one panel of 30

potential jurors was questioned in this case, which means that the entire group of people who eventually formed the jury that convicted the defendant was exposed to the State's improper extended narratives and questioning during *voir dire*, and multiple members of that panel were improperly questioned by the State, individually, about the hypothetical "examples" during that process. Thus, this case stands in sharp contrast to *Rinehart*, in which the Illinois Supreme Court ultimately found the questions at issue were permissible because, although inartfully posed, (1) their purpose nevertheless was "to uncover any bias," (2) they "were brief, *** the State did not elaborate on the subject, [and] instead accepted the answers it received," and (3) the questions were not asked of the entire panel of potential jurors, but instead were asked of only "one-fifth of the venire." 2012 IL 111719, ¶ 21. Likewise, we reiterate that the Illinois Supreme Court has noted that when deciding whether a particular line of *voir dire* questioning is acceptable in a particular case, that questioning "must be considered in the context of the charges" faced by the defendant. *Encalado*, 2018 IL 122059, ¶ 34. In this case, the defendant faced only one charge, which was based on his alleged unlawful possession of ammunition; the legal concept of possession, as noted above, was one of the improper areas of *voir dire* by the State.

¶ 40    For all of these reasons, we reverse the defendant's conviction and sentence and remand for a new trial. To the extent that we believe they may arise on remand at the defendant's new trial, we briefly address the defendant's other contentions of error in this case. See, *e.g.*, *People v. Stitts*, 2020 IL App (1st) 171723, ¶ 33 (appellate court has authority to address issues likely to recur on remand, but should not decide issues where resolution will have no effect on disposition of present appeal). With regard to the defendant's contention that the trial judge abused his discretion "by allowing the State to introduce, without proper notice, other-crimes evidence of multiple previous occasions in which [the defendant] was alleged to have used or possessed firearms, both inside and outside the state of Illinois," we first note that the defendant's contentions related to the timing

21

of the State's disclosure of the other-crimes evidence are now moot, because the defendant is now fully apprised of the evidence that he alleges was previously wrongfully withheld from him, and will have ample time to prepare to contest it at his new trial.

¶ 41    As a general rule, evidence of other crimes is not admissible for purposes of showing the defendant's propensity to commit a crime; other-crimes evidence may be admissible to prove the character of a person in order to establish *modus operandi*, intent, identity, motive, or absence of mistake. See Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Even if the other-crimes evidence is otherwise admissible it may be excluded if it is irrelevant or if the risk of undue prejudice substantially outweighs its probative value. See Ill. R. Evid. 403 (eff. Jan. 1, 2011). With regard to the evidence offered where it was claimed that the defendant held a gun while hunting in Louisiana, after reviewing the record, we find that, for purposes of the State's case-in-chief, the probative value of this evidence was substantially outweighed by its prejudicial effect. Ill. R. Evid. 403 (eff. Jan. 1, 2011). We take no position with regard to the admissibility of this evidence in rebuttal, should the door be opened to rebuttal. As to the defendant's claim that the trial judge did not engage in the required balancing test before deciding to admit other evidence where the defendant was accused of possessing weapons on his property, we trust that on remand, if the State again wishes to introduce this evidence, and the defendant again contests it, proper proceedings will be held prior to trial and the proper balancing test will be performed by the trial judge. With regard to the defendant's contention that the State made repeated and egregious misstatements of the law applicable to this case throughout the trial, including in closing argument, we likewise are confident that on remand the parties and the trial judge will ensure that any statements of law made at the defendant's new trial are both accurate and presented to the jury at the proper time and in the proper manner.

22

¶ 42     Finally, we note that although the defendant has not challenged, on appeal, the sufficiency of the evidence used to convict him, we nevertheless have considered all of the evidence presented at trial, and find it sufficient to support the defendant's conviction. Accordingly, double jeopardy does not prevent the retrial of the defendant. See, *e.g.*, *People v. Jamison*, 2014 IL App (5th) 130150, ¶ 18 (if evidence was sufficient to convict the defendant, principles of double jeopardy do not preclude retrial). We reach this conclusion because when we consider whether double jeopardy bars a retrial, the relevant question before us is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime or crimes beyond a reasonable doubt. See, *e.g.*, *People v. Lopez*, 229 Ill. 2d 322, 367 (2008). We conclude that although the majority of the evidence in this case was circumstantial, a rational jury could have found beyond a reasonable doubt, from the totality of the evidence, the essential elements of the crime of which the defendant was convicted.

¶ 43                                    III. CONCLUSION

¶ 44     For the foregoing reasons, we reverse the defendant's conviction and sentence, and remand for a new trial.

¶ 45     Reversed; cause remanded for new trial.

23